SAMUEL R. BUMPUS AND MARY ANN BUMPUS v. ISAAC N. BUMPUS.

*Fraud—Must be clearly proven—Laches, " he who asks equity must do equity."*

1. Where relief is sought on the ground of fraud, it must be clearly proven as alleged, is not lightly to be inferred, and the defrauded party must have made prompt complaint when the facts came to his knowledge.

2. A son, after attaining his majority, devoted eighteen years of his life to carrying on the business and promoting the interests and welfare of his parents, through which debts were paid and property accumulated, aggregating $20,000 in value, all without pay, salary or reward of any kind. During said years he purchased real estate with the proceeds of the business so carried on, taking the title in his own name, costing $2,475. The son's services were shown to have been worth from $500 to $800 per year.

*Held*, that if complainant was otherwise entitled to a conveyance of said lands as prayed for, she cannot ask it in this Court without first recompensing, or offering at least to recompense, defendant for his services rendered for her benefit, under the familiar principle that "he who asks equity must do equity."

*Held*, further, upon a review of the testimony, that complainant's claim is not substantiated by the evidence, and is inequitable under the facts and circumstances disclosed.

Appeal from Wayne. (Jennison, J.) Argued October 9, 1885. Decided January 25, 1886.

The bill was filed to obtain a conveyance of certain real estate alleged to have been obtained by defendant in fraud of complainants' rights and was dismissed, from which decree complainants appeal. The facts are stated in the opinion. Affirmed.

*J. Willard Babbitt* and *Samuel W. Burroughs*, for complainants:

Relationship of parties excuses laches: *Wright v. Wright*, 37 Mich. 55; and there is no laches in deferring suit to quiet title until the complainant is damnified: *Post v. Campau*, 42 Mich. 99.

*Cutcheon, Crane & Stellwagen*, for defendant:

Complainants' case fails on the proofs. She seeks relief on the ground of fraud. Where fraud is charged "the proof should be so clear and conclusive as to leave no rational doubt upon the mind as to its existence:" *Buck v. Sherman*, 2 Doug. 176–182; *Pogodzinski v. Kruger*, 44 Mich. 79; *Campau v. Lafferty*, 50 Mich. 114–117. No such proof has been produced. Complainant has lost her right to relief by laches. The first deed was made June 5, 1867, the last one May 8, 1871. She knew the facts as they occurred. Suit was commenced June 3, 1882. The delay is unreasonable: *DeArmand v. Phillips*, Walk. Ch. 186, 199; *Lyon v. Waldo*, 36 Mich. 357; *Wilbur v. Flood*, 16 Mich. 40; *Carroll v. Rice*, Walk. Ch. 373, 379, 380; *Disbrow v Jones*, Harr. Ch. 102. Complainant cannot have the conveyances set aside without compensating defendant for his eighteen years' service: *Faxton v. Faxton* 28 Mich. 159, 161; *Wilbur v. Flood*, 16 Mich. 40–45; *Lyon v. Waldo*, 36 Mich. 345–357; *Jewett v. Petit*, 4 Mich. 508; *Dunks v. Fuller*, 32 Mich. 242–245.

The Leonard and Yost lands were paid for with complainant's consent, after she knew the deeds were made to defendant. Under these circumstances she cannot recover upon the ground that the proceeds of her property paid part of the purchase price: How. Stat. § 5569 ; *Weare v. Linnell,* 29 Mich. 224; *Hooker v. Axford,* 33 Mich. 453.

CHAMPLIN, J. The bill of complaint in this case was filed June 3, 1882, by Mary Ann Bumpus and Samuel R. Bumpus, in the circuit court for the county of Wayne, for the purpose of obtaining a decree compelling defendant to convey to the complainants certain parcels of real estate held by him under deeds of purchase as follows: (1) Deed dated June 5, 1867, consideration $100, from John S. Jackson and wife to defendant, recorded in the office of the register of deeds for Washtenaw county, in liber 62 of deeds, p. 331, on June 25, 1867. (2) Deed dated January 15, 1868, consideration $25, from Julia A. Palmer to defendant, recorded in office of said register of deeds, April 9, 1868, in liber 64 of deeds, p. 181. (3) Deed dated January 27, 1868, consideration $1,000, from Oscar Leonard and wife to defendant, recorded February 6, 1868, in office of register of deeds of Wayne county, in liber 132 of deeds, p. 216. (4) Deed dated April 6, 1868, consideration $150, from William E. Warner and wife to defendant, recorded April 9, 1868, in office of register of deeds of Washtenaw county, in liber 65 of deeds, p. 247. (5) The undivided one-half of premises described in deed dated May 8, 1871, consideration $2,400, from Enoch Yost and wife to defendant and Myron M. Bumpus, recorded in office of register of deeds for Washtenaw county, April 2, 1875, in liber 81 of deeds, p. 309. The bill alleges, among other things, that complainants are parents of defendant; that he lived with them the same as any son, as a member of their household, enjoying the comforts of a good home, and that no different business relations existed between complainants and defendant, after his arrival at the age of majority, than before that time, and no wages were ever expected to be paid by complainants to defendant, and that defendant never expected any consideration for his services

other than the comforts of a home as furnished him by complainants; and that complainants, from a period soon after the defendant arrived at the age of twenty-one years, intrusted the management of their business to the defendant, until the time of his marriage in 1877, excepting eight or ten months in 1868 and 1869; and that while so acting he made the bargains for the purchase of the above-described pieces of land and paid for them, as per dates and amounts as aforesaid, with the moneys, goods and chattels of complainants, and fraudulently took the title thereto in his own name instead of in the name of complainant, as he should have done; that he so fraudulently obtained the deeds without, at the time, the knowledge or consent of complainants, and as soon as they found it out, against their protestations; that complainants again and again demanded of said defendant that the deeds fraudulently taken by defendant be immediately made over to the complainants; that defendant at various times promised so to do, but kept putting it off from time to time, and finally absolutely refused so to do.

The answer of defendant alleges that he arrived at the age of twenty-one years on the twenty-seventh day of February, in the year 1859; that this defendant has a younger brother whose name is Myron M. Bumpus, and that before this defendant arrived at the age of twenty-one years the said complainants were very anxious that this defendant should remain at home, carry on the said farm, manage all their business interests, and they also wished to give their youngest son, Myron M. Bumpus, a good education, and to qualify the said Myron for the practice of law, and to furnish him, the said Myron, with all necessary facilities for entering upon the practice of the legal profession, or any other avocation which he might thereafter choose to pursue; that soon after arriving at the age of twenty-one years, the said complainants made an oral agreement to and with this defendant, whereby it was mutually agreed by and between the said complainants and this defendant in substance and effect as follows, namely: that this defendant should remain at home, and should cultivate, carry on, and manage their said farm,

keep the same in good repair, should furnish the said complainants a good and comfortable support, should furnish all money necessary to educate the said Myron M. Bumpus, should pay all of said Myron's necessary expenses while procuring a legal education, and should also furnish the said Myron with all necessary funds to open a law office, and aid him pecuniarily in establishing himself in law business, or in any other business which he might choose to pursue; and that, in consideration of the foregoing, it was further mutually agreed by and between the said complainants and the defendant that this defendant should have and be entitled to whatever real and personal estate he might thereafter accumulate, by means of his personal labor, industry and management, over and above the real and personal estate then owned by the said defendant Samuel R. Bumpus at the time of making said agreement, whenever thereafter he should demand a conveyance and transfer of the same to him; and that it was in pursuance of and in reliance upon said agreement that he managed the said complainants' business. The answer further alleges, and the proofs tended to show, that the only property complainants had at the time defendant came of age was a farm called the "Homestead," of less than 160 acres, the title of which was in Samuel R. Bumpus, of the value of $6,400, and personal property to the amount of $500.

The proofs tended to show that under the management of defendant improvements were made and property accumulated as follows: From twenty to thirty acres of land were cleared upon the old homestead. A corn-house costing $250 was built. In 1860 or 1861 a horse-barn costing $400 was built on the old homestead. A long barn was built prior to 1864, at a cost of $800. On April 14, 1864, a parcel of land was purchased from David Dickerson, the title of which was taken in the name of Mary Ann Bumpus. This cost $1,400. March 27, 1865, two parcels of land were purchased from John Hyatt at a cost of $5,960, the title of which was taken in the name of Mary Ann Bumpus. The next purchases of real estate were the five parcels of land first above enumerated, and for the prices above stated; in 1868 a cider-mill

costing $350 was built; in 1871 some buildings were moved upon the Jackson property and used as a cooper-shop, costing about $100. The buildings on the Hyatt farm were repaired at an expense of $250 to $300. About 480 rods of board fence was built on the Hyatt farm, costing about a dollar a rod. He turned over to his mother in June, 1877, when he was driven from home, about $1,000 in cash and notes, and left upon the farm personal property worth several thousand dollars and estimated by the defendant to be worth $9,000. The testimony shows beyond question that this accumulation of property was due to a great extent to the energy, foresight and management of the defendant.

The present suit is an outcrop of those unfriendly feelings that sometimes arise to mar the harmony of the family relation. Samuel R. Bumpus seems to have been a peaceable, inoffensive man, with no force of character, and quite under the influence and control of his wife, Mary Ann Bumpus, who was of a decidedly nervous temperament and strong will, and still stronger passions, which influenced her actions and gave an unjust bias to her disposition towards defendant. She asserted the claim that she was the proper person to have the custody of the property, and insisted that the title should be vested in her. There does not appear to be any reason, so far as the record shows, existing either at law or in equity why this should have been done. If the accumulated property was paid for from the proceeds of the farm, and an equity arose based upon the payment of the purchase money, such equity would arise in favor of her husband rather than her; but if the consideration paid was the outcome of the labor, skill, foresight and management of the defendant, it is difficult to perceive how complainant could avail herself of the fact to raise an equity in her favor. She managed the household affairs of her husband with prudence and economy, but this was no more than she was in duty bound to do as a wife, and it has never been considered a reason for absorbing or appropriating the property accumulated through joint exertion of husband and wife to her sole and exclusive use. She claims a right to the convey-

ances because, as she says, there was an understanding that the title to all land purchased should be taken in her name. The terms of such understanding are neither set out in the bill nor given in the evidence. No consideration is stated or proven to support such agreement. What it was, if it ever existed, is altogether vague and uncertain. I do not think such an understanding is satisfactorily established by the evidence. It is denied by defendant, and the circumstances attending the several transactions militate strongly against the claim asserted by the complainant. It is stated in the bill that on or about the first day of September, 1868, the complainant and her husband directed the defendant to leave the house of complainant and not return. The reasons stated in the bill for this were that defendant refused to make deeds of the property embraced in the first four deeds above described; that defendant became very dissolute in his habits in the summer of 1868, and spent the money belonging to complainants in riotous living; that he collected rents of tenants and refused to pay it over. In her testimony given on the direct examination, she was asked the reason why he came to go away, and she testified that "he got to acting up contrary; he was taking deeds, and going to put them on record, and we got into a disturbance." This was in September, 1868, and it will be noted that the last deed taken in defendant's name previous to that time had been recorded on April 9, 1868, and there were no deeds then taken which had not been recorded some time previously. At all events, he returned again after an absence of about nine months, and was again intrusted with the full management and control of the business, and in May, 1871, purchased the Yost farm, at a cost of $2,400, for which there were notes given, signed by the complainant and her husband, Myron and defendant, and these notes were paid from barrels manufactured at the cooper-shop managed by defendant. All of the indebtedness had been paid, and in addition, the improvements and accumulations were made prior to the month of June, 1877. It appears that in the early part of the year 1877, Isaac N., the defendant, married without his

mother's consent and without her knowledge; that when she ascertained that fact she was very much put out, and began to find fault with defendant's management of business, and called upon him to hand over what money and notes he had in his hands, which he did, amounting to over $1,000. A few days after this, without any just cause, as appears from the testimony, as the defendant drove into the lane near the barn with a span of colts hitched to a cultivator, complainant, in a violent passion, attacked defendant with a flail-stick, and gave him a severe beating, and drove him from home with nothing but his working clothes on, and $12 in money which he happened to have in his pocket, and ordered him never to return. Two or three years later, at her request, her husband conveyed to her the homestead farm, and gave her a bill of sale of all the personal property then owned by Samuel R. Bumpus. He was in feeble health and sick at the time. He died October 10, 1883, and the suit has since been prosecuted by her as sole complainant.

She bases her claim for equitable relief upon the alleged fraud of defendant in taking the deeds in question in his own name, and the Yost deed in the name of himself and his brother Myron, contrary to instructions to have such deeds taken in complainant's name. I do not think a case of fraud is established by the proofs. I am not convinced from the testimony that any such understanding or instructions were given that the deeds in question should be taken in complainant's name. No sufficient reason is shown to have existed why they should have been so taken. By her own testimony she shows that she knew that the first four deeds were taken in defendant's name soon after they were made, and before she drove him from home the first time; and she was informed on the day the Yost deed was made that it was taken running to defendant and Myron, and she expressed herself as satisfied therewith. If, therefore, there was any fraud practiced, she knew of it from 1868, and acquiesced therein, and took no steps to set the conveyances aside on the ground of fraud until the filing of the bill in this case in June, 1882. As an excuse for the delay, she

alleges in her bill and testifies that defendant often promised to make a conveyance of the lands to her, but as often neglected. The defendant denies this, and says that he never promised or agreed to convey to her. I think the defendant's testimony more consistent with the facts developed by the evidence. It is quite unlikely that complainant would have remained quiet fourteen years upon the naked promises of defendant, so often repeated and broken, had there been any substantial ground for her to complain. Such delay in asserting what she considered her just rights would evince a temporizing and forgiving disposition in complainant quite contrary to that manifested by her towards her son on the occasions of setting him adrift in 1868 and 1877.

The general rule is, where fraud is charged, that it must be clearly proved as alleged, and is not to be lightly inferred, and the party affected by it must complain promptly when the facts come to his knowledge: *Campau v. Lafferty,* 50 Mich. 114; *Campau v. Van Dyke,* 15 Mich. 371; *Pogod. zinski v. Kruger,* 44 Mich. 79; *Buck v. Sherman,* 2 Doug. 176.

There is another principle, in the administration of justice, which prevents granting the relief prayed for by complainant, embodied in the maxim that "he who asks equity must do equity." The fact is established beyond all controversy that the defendant remained at home and devoted eighteen years of his life, from the time he arrived at the age of twenty-one, to carrying on the business and promoting the interests and welfare of his parents, through which debts were paid and property accumulated, aggregating $20,000 in value. His services were shown to have been valuable, and worth from $500 to $800 a year. But according to complainant's statement, he did all this without pay, salary or reward of any kind. She was asked, when on the witness stand, and testifying in her own behalf, this question:

"*Question.* Upon what conditions, if any, did Isaac remain with you after he became of age? *Answer.* No conditions; only he was to wait until I got through with the property before he had any." And again, on cross-examination:

"*Question.* How much did you pay him a year for his services? *Answer.* Didn't pay him anything, and didn't calculate to. *Q.* What was he doing all this work for? *A.* He was doing it, and if I was a mind to leave him anything I could do it. *Q.* And if you wasn't, you needn't? *A.* No, I always told him he could wait until I was through with it. *Q.* Never promised anything about it? *A.* I told him he couldn't have a red cent until I got through with it."

I do not think that, after eighteen years of hard work in complainant's interest, she is entitled to demand the relief prayed for in this case, were she otherwise entitled, without first recompensing, or offering at least to recompense him, for his services rendered for her benefit. If there was a tacit understanding that he was to remain at home and work and spend his life's labor in accumulating property for his mother, without pay or reward other than a share when she was through with it, she broke that understanding when she drove him from his home with a flail-handle, and ordered him never to return. Her claim is not substantiated by the evidence, is inequitable under the facts and circumstances, and her bill of complaint was rightly dismissed by the court below, and the decree appealed from is affirmed, with costs.

The other Justices concurred