## BROOKS v. CULVER.

1. FRAUD —STOCK AND STOCKHOLDERS —DECEIT —SALES —INJUNCTION — PLEDGE — BUYER'S FAILURE TO SHOW RELIANCE ON STATEMENTS.

Where complainant purchased of defendant stock in a corporation of which complainant later, in pursuance of the design with which he bought the stock, became manager, in defendant's stead, in a suit in equity to enjoin the foreclosure of the stock pledged to defendant to secure a part of the purchase price, the complainant was not entitled to relief upon a record showing that he did not place reliance on the representations of defendant as to the amount of assets, liabilities, and as to the financial condition of the corporation, but acted upon a full investigation and information obtained by other means.[1]

[1] Duty of purchaser of corporate stock to verify statements made as to its financial condition, see note in 14 L. R. A. (N. S.) 1176.

Fraud as a ground of relief from subscription to stock after insolvency of corporation, see note in 31 L R. A. (N. S.) 900.

2. SAME—BURDEN OF PROOF—EVIDENCE.

> The burden of proof being on complainant to show fraud by
> clear and conclusive testimony, complainant was not entitled
> to damages for deceit which he endeavored to establish by
> his own unsupported testimony, denied by defendant.

Appeal from Marquette; Flannigan, J. Submitted December 11, 1911. (Docket No. 49.) Decided February 10, 1912.

Bill by Arthur Brooks against Rush Culver for an injunction and other relief. From a decree dismissing the bill, complainant appeals. Affirmed.

*Ball & Ball*, for complainant.

*William P. Belden* and *W. S. Hill*, for defendant.

STEERE, J. The bill of complaint is filed in this cause to enjoin defendant from, selling certain stock in the Northern Lumber Company, pledged by complainant as collateral to his note for $5,833.33, given September 22, 1909, in part payment for said stock; and to obtain a reduction in the amount of said note on the ground that misrepresentations were made by defendant as to the value of the stock for which the note was given.

The Northern Lumber Company is a corporation engaged extensively in logging and the manufacture and sale of lumber at and around Birch, in Marquette county, Mich. It had a capitalization of $300,000, divided into shares of $100 each. It was organized with $200,000 of stock issued and $100,000 of treasury stock. Subsequently about $50,000 of its treasury stock was sold. At the time of the events which resulted in this litigation, the stock was mostly owned by Mr. Miller, Mr. Packer, and Mr. Owlett, of Wellsboro, Pa., and defendant Culver, of Marquette, Mich. Defendant owned 600 shares and was president and general manager of the company, Mr. Owlett was secretary, and Mr. Miller, treas-

urer. These gentlemen, with a Mr. Townsend, constituted the directors. The Pennsylvania stockholders held a controlling interest in the company. They had become dissatisfied with defendant's management of the business and contemplated a change. To that end they negotiated with complainant, a West Virginia lumberman, to buy an interest in the business and take the management.

It may aid in a better understanding of the case to state that the complainant, Brooks, is a practical lumberman who, previous to his connection with this company, had carried on a similar business in Painesville, W. Va. Messrs. Owlett and Packer are lawyers living at Wellsboro, Pa.; defendant Culver is a lawyer at Marquette, Mich. Mr. Packer, aside from his law practice and his connection with the Michigan company, was also a member of some company doing business in West Virginia; his interests there being, for the most part, looked after by a partner, O'Connor by name. Complainant had slightly known Packer for five or six years from his occasional visits to West Virginia in connection with his interests there. Pursuant to telephone communication from Mr. Packer (presumably from Pennsylvania) and a personal interview the following day with O'Connor at Painesville, W. Va., in which the proposition of becoming business manager of their Michigan lumber interests was "put up" to him, complainant, in June, 1909, made a visit to Birch, Mich., "to see whether he would care to go there." Mr. Owlett, Mr. Packer, and Mr. Miller timed their visit to Birch to be contemporaneous with complainant's. This was the first that complainant had met any of the parties except Mr. Packer. Complainant made a stay of five or six days, looking over the stumpage, the plant, the financial conditions, "outside operations," and general details, getting all the information he could in order to determine whether he should accept or reject the proposal of the Pennsylvania stockholders to buy stock and take charge as general manager. As a result of the visit, he concluded

to purchase $10,000 of the treasury stock, with an option of $30,000 more by the first of the year, all at par. The money for this $10,000 of stock was sent by complainant to Mr. Owlett, the secretary, the following 1st of August, and the transfer was made at the time of his second visit to Birch in September. At that time complainant went to Birch expecting to supersede defendant and take charge of operations pursuant to an understanding previously reached with the Pennsylvania stockholders.

In April, 1908, Mr. Miller, who was a business man and skilled accountant, went to Birch, in the interest of the Pennsylvania stockholders, where he remained about six months, taking charge of the office, personally going over the books and accounts, and investigating the financial affairs of the company. Messrs. Miller, Packer, and Harrison, who was a partner of Packer, had made periodical trips to Birch, looking after the financial status of the company, and for three years a regular bookkeeper, Claude Ingalls, had been employed, who had entire charge of the books and accounts. Ingalls testifies that Mr. Harrison had been up there in August, 1909, and "was in the office right along three or four days working on the books, making memoranda, taking notes, and asking me questions. I understood he came there to go through the books himself." Mr. Owlett testifies:

"We found a great deal of complaint by people who were dealing with Mr. Culver. There was complaint made that he would sell lumber to parties and degrade it, and we found a good many matters coming up continually that we didn't know anything about, and general loose management. We thought Mr. Culver was a better lawyer than he was a lumberman."

After the transactions of the parties in June, affairs remained about *in statu quo* until the middle of September following, when, as Mr. Packer testifies—

"I and the other Wellsboro stockholders had reached the conclusion that it would be advisable to make Mr. Brooks general manager, if he would assume it."

Mr. Owlett, secretary of the company, and a witness for complainant, testifies that, based on the general conditions as they had previously found them at Birch, the eastern stockholders had reached the conclusion that it was desirable to make a change in the management; that complainant went there with the idea of assuming the management of the company and taking a large interest in the business if things were as he expected to find them. Defendant was not informed of the proposed change until some time after the arrival of the eastern stockholders at Birch in September, 1909. He objected to resigning unless he sold his stock in the company, and the change of management was postponed for some time while negotiations to that end were going on between defendant and Packer and Owlett. Matters dragged until complainant concluded the change was not likely to take place. He testifies he—

"Told Mr. Packer I didn't think they would go on and change managers. I thought it would be embarrassing for them, the way the thing looked, and they didn't want to do it; they kind of hated to do it, I thought."

Defendant insisted that the whole of this stock should be taken, and Packer and Owlett were trying to adjust the matter amicably by agreeing to take one-half. It was finally arranged that one-half of defendant's stock would be bought at that time. Defendant claims, and testified, that they agreed to take all his stock—one-half then, when he would resign as manager, and the balance within one year. They deny that it was agreed to take more than 200 shares. Be that as it may, defendant resigned the management, and complainant was installed as his successor, complainant taking 100 shares, and Owlett and Packer each 50 shares. Owlett looked after the transfer of the stock. Defendant claims that he sold the stock to Owlett and Packer and did not know how they were to distribute it until the transfer was made after all negotiations were completed.

Complainant claims that he personally negotiated for the 100 shares of stock and bought the same from defendant, who made various misrepresentations as to the indebtedness of the company and the prices they were getting for lumber, upon which he relied, and by which he was induced to buy the stock. The price paid for this stock was slightly above par. Defendant received through Owlett complainant's check for $5,000, and his note for $5,833.33 payable in three months, with a certificate for the 100 shares of stock, which defendant had assigned to complainant, attached, as collateral security. The note becoming past due and unpaid defendant took steps to sell the stock and realize on the security, whereupon this bill was filed.

The following questions of law and fact are presented by the record: Did defendant negotiate the sale of the 100 shares of stock with complainant, or with Owlett and Packer? Did he make false and fraudulent statements to complainant as to the indebtedness of the company and the prices it was getting for lumber? If so, was complainant, relying on them, deceived and misled and thereby induced to buy the stock? If so, what is the measure of damages?

That there were protracted negotiations between Owlett and Packer and defendant relating to a change of management and a purchase of defendant's stock, is clearly shown. Owlett testifies:

"I told him (Culver) I would talk to Mr. Packer and Mr. Brooks, which I did, and then Mr. Packer and I went and talked to him and told him that Mr. Brooks would buy $10,000 of his stock, Mr. Packer would take $5,000, and that I would take $5,000."

Complainant arrived at Birch on September 15th and says he agreed to take the stock in question on September 22d, just a week later. In the meantime he had been on the ground, familiarizing himself with the situation. He had previously bought $10,000 worth of stock at par and

taken an option on $30,000 worth, as the result of his previous investigations and his associations and dealings with the Pennsylvania stockholders, with whom he was allied and with whom he was co-operating to depose defendant from his position as manager of the business. He knew that these stockholders lacked confidence in defendant and were seeking to get rid of him; that, in order to accomplish such result, they were soliciting complainant to buy this stock, the ultimate result of which would be his engagement as manager, in the position vacated by defendant. The significance of this situation of affairs is not only a lack of faith in defendant but a distrust of him.

Assuming that defendant did make the false representations claimed by complainant, it is difficult to believe that, relying upon them, he was thereby deceived and induced to make the purchase. All the surrounding facts and circumstances and relations of the parties naturally, and we think quite clearly, suggest that complainant was led to purchase this stock by his own investigations, supported by the confidence he had in the Pennsylvania stockholders, with whom he had already dealt, and who had shown their confidence by selecting him as their manager, and by his desire to assist them in getting defendant out of the way so that he himself might secure a good position as manager in charge of a large business in which he was already financially interested.

The gist of complainant's right to recover is grounded on the proposition that he was fraudulently induced to purchase this stock through false representations made to him by defendant as to the indebtedness of the company, the amount of its assets, and the condition of its business; that he believed them to be true; that thus believing and relying on them he was thereby deceived and induced to purchase the stock. His testimony in that particular is directly contradicted by the testimony of the defendant. So far as the record discloses, the parties are equally truthful and equally interested.

The burden of proof is upon complainant. When relief is sought on the ground of fraud, it must be proven clearly and conclusively. It is not lightly inferred, and the defrauded party must have made prompt complaint when the facts came to his knowledge. *Buck* v. *Sherman*, 2 Doug. 176; *Bumpus* v. *Bumpus*, 59 Mich. 95 (26 N. W. 410).

"It is an elementary principle that he who impugns a transaction as fraudulent, which may or may not be so, is not sustained by his own assertion alone in case he is disputed, but has the burden on him to make his allegation good by independent evidence; for he who alleges that a transaction was fraudulent must prove it." *Hutchinson* v. *Poyer*, 78 Mich. 337 (44 N. W. 327).

We think the inference from the independent evidence in this case is that complainant was led to purchase the stock by his own investigations, his desire to become manager of the business, and the representations and overtures of the eastern stockholders with whom he was associated, rather than by anything said or done by defendant. In this view of the case other questions raised by the record become unimportant.

The decision of the circuit judge dismissing complainant's bill is affirmed, with costs.

MOORE, C. J., and BROOKE, STONE, and OSTRANDER, JJ., concurred.