SOMERS *v.* FERRIS.

1. Deeds—Competency of Grantor—Intoxication.

Evidence tending to show that the grantor of certain real property was incapacitated by excessive use of intoxicants from entering into a valid contract of conveyance, considered as an issue of fact, and *held,* not sufficient to sustain a decree annulling the deeds.

2. Same.

A drunkard is held incompetent to execute a conveyance only upon proof that at the time of the act, his under-

standing was clouded or his reason dethroned by actual intoxication.

3. SAME—INADEQUACY OF PRICE—EQUITY.

The court of equity will inquire into the inadequacy of price paid for land which was conveyed upwards of six years previously to the date of commencing suit, only so far as may be necessary to ascertain that the price paid was not so grossly inadequate as to shock the conscience and necessarily imply fraud.

4. SAME—CONTRACTS—LACHES.

Where complainant knew the facts in relation to his claim that certain conveyances were made when he was incapacitated from executing a valid deed, within a year after he conveyed the real property, but he took no steps to set aside the deeds within five years, during which time defendant expended large sums in clearing up the title and making improvements, the claim was barred by laches.

Appeal from Missaukee; Lamb, J. Submitted April 21, 1914. (Docket No. 98.) Decided October 2, 1914.

Bill by George Somers against Elbert C. Ferris and others for the cancellation of certain deeds. From a decree for complainant, defendants appeal. Reversed.

*Gaffney, Miltner & Millington,* for complainant.

*Dan Youngs* and *Broomfield & Worcester,* for defendant Ferris.

STEERE, J. This suit was instituted to obtain cancellation of two deeds executed by complainant, George Somers, purporting to convey to defendant Elbert C. Ferris 320 acres of land, located in Missaukee county, Mich. The grounds urged for such relief are want of consideration and fraud. Elbert C. Ferris is the active and chief defendant; the others named as defendants being his wife and certain parties holding mortgages on said land.

The bill of complaint asks for an accounting, an injunction to restrain cutting and removing timber from the premises, and a decree declaring null and void two described deeds from complainant to defendant, one of 160 acres in section 18, town 24 north, of range 6 west, dated May 4, 1906, and the other of two 80-acre tracts in sections 6 and 8, of the same town and range, dated January 15, 1907.

The substance of complainant's grievance, as stated in his bill, is that defendant Ferris contributed largely towards complainant developing into an habitual drunkard by furnishing and freely selling him intoxicating liquor, encouraging him to indulge his appetite for the same to excess, until his mind became weakened and his judgment impaired to the extent that he was easily misled and became a prey to any designing person; that when complainant had reached such condition, and while he was under the influence of liquor, Ferris, having previously obtained his confidence, fraudulently persuaded him to execute the conveyances in question for a grossly inadequate consideration.

At the time this suit was heard, complainant was 65 years of age. He had lived in Missaukee county for about 34 years, much of the time in Norwich township, where he first settled on emigrating to the county, with his wife, from his former home in Genesee county. He was then recently married to a second wife, having been divorced from the first. He stated that he then had practically no property and but $1.50 in money. He secured and settled upon some wild land, which he engaged in clearing and cultivating, and later bought and sold stock, some of which he butchered, selling the meat to lumber camps. He appears to have at first been industrious and thrifty. For some years he prospered to a degree and came to be recognized as a man of some standing in

his community, having held school and township offices at various times. At the expiration of 19 or 20 years, he had developed a home farm of 80 acres, improved and mostly cleared, had accumulated some stock, teams, tools, etc., and secured, though not fully paid for, the 320 acres in question; but he had by that time also formed irregular habits, resulting in unsatisfactory domestic relations, and about 15 years prior to commencement of this suit he separated from his wife, after a private adjustment and division of property interests. He conveyed to her their 80-acre home farm, upon which there was a mortgage of $700, and gave her some horses, cows, etc.; she releasing to him her dower interest in the remaining 320 acres, now in question. Thereafter he lived apart from his family, spending much of his time in a small village, not far away, named Stittsville, where he made his headquarters in a hotel with an auxiliary bar, run by a man named Dorrity. He had a house and some clearing on his 160-acre tract of land, which he called the Cole place, where he spent part of his time, at times did some farming, dealt in stock, teamed, and got out forest products. His intemperate habits became more pronounced as time went on, until, as he states, he spent half of his time at Stittsville "drinking whisky," especially after defendant came there.

In the spring of 1905, Ferris bought the Stittsville hotel and saloon from Dorrity, with it acquiring the patronage, society, and good will of Somers. Ferris took out a liquor dealer's license in May, 1905, and ran both the hotel and saloon business in his own name until May, 1906, when the license was taken for the ensuing year in the name of his son. The elder Ferris claimed to have sold the bar business to the latter, though he remained at and continued to run the hotel as before. There was apparently little change in the general management of the business as a whole, until October, 1906, when he leased the hotel

to a man named Haynes and quit the business. During Ferris' regency Somers is shown to have frequented the hotel bar and drank intoxicating liquors to excess, becoming more and more dissipated, often indulging in protracted sprees and becoming helplessly intoxicated. He made his headquarters and boarded much of the time at the hotel while defendant ran it, and was abundantly supplied with intoxicating liquors by both the elder and younger Ferris, whether drunk or sober, though defendant and his son claim to have often refused him, when he was intoxicated and had "got enough." Other testimony indicates that opinions of the critics waver as to how much was enough. He is shown to have frequently passed through all stages of intoxication at this saloon, his transition progressing unchecked from hilarious sociability and prodigal generosity, which temporarily attracted to him a following of loyal adherents, until it reached stupid drunkenness, to the entertainment and apparent envy of kindred spirits who were less successful in getting helplessly drunk, and who at that stage sometimes made him the victim of their coarse jokes. A neighboring farmer, named Hunt, was an associate and close rival in these excesses. Another neighbor, and acquaintance of 30 years' standing, who states complainant had been a common drunkard for the past 10 or 12 years, and that his faculties were somewhat impaired thereby, though even in 1906 and 1907 he was above the average in mental capacity when sober, sums up the situation by the statement, "Whisky led these two men to deteriorating about as low or lower than any two men in the community."

Four written instruments signed by Somers, which he claims were without adequate consideration and obtained by fraud at times when he was mentally incompetent, are involved in this controversy: The deed of the 160 acres dated May 4, 1906; an option

for the sale of his land dated November 2, 1906; a renewal of said option dated January 4, 1907; and the deed of the two 80-acre tracts dated January 15, 1907. The important questions for consideration are his mental condition when he executed those instruments, for it is undisputed that when sober and in his right mind he was bright, capable in business matters, and abundantly able to protect his own interests in any such transaction.

In portions of his testimony Somers states in variant language that during the period these transactions took place, his intellect was so weakened and impaired by long and excessive indulgence in intoxicating liquor that he had no realizing sense of what he was doing, nor distinct recollection of what took place, describing his then condition as "just negative," with his brain "ossified and congealed," and his memory faded to a point where he was only willing to venture a "guess" that he was then "drinking whisky," while in other portions of his testimony he discloses a keen recollection of the details of transactions he had either previously denied taking place at all or stated that he had no remembrance of them.

The deed of May 4, 1906, was, at the time of its execution, without consideration, having been given in furtherance of a scheme to perpetrate a fraud upon the township authorities. Ferris and Somers each testified that the other proposed the scheme. In the spring of 1906 Ferris found difficulty in getting acceptable bondsmen for his saloon business, and it was decided his son should apply for the license; he to qualify and act as his son's bondsman. To enable him to qualify as such, Somers and a neighboring farmer, named Pittz, agreed to and did each deed Ferris 160 acres of land, and a man named Freeman 40 acres more, with the understanding Ferris would deed the property back to the real owners when the bonds were approved. Somers, Pittz and Ferris together

drove over to Lake City, the county seat, where the deeds were prepared by and acknowledged before one of Somers' counsel in this case. On that day Somers refused to take a drink at the hotel with Pittz, saying he had to attend to some business and was going to keep sober. The evidence is conclusive that he did keep sober and fully understood the nature and purpose of the transaction. He testified on cross-examination that he knew what he was doing and executed the deed to Ferris so that he would have sufficient property in his name to qualify on his son's liquor bond.

The next instrument in the order of events, signed by Somers, was an option to Ferris for 45 days, dated November 2, 1907, authorizing him to, within that time, find a purchaser or himself buy the 320 acres in question at a price of $1,950, with a 5 per cent. commission, whether he found a purchaser or bought it himself. Though Somers testified to the details of the transaction and said the option was read over to him at the time, he also stated that he could not remember whether he was drunk or sober when he signed it. It was prepared by an attorney named Gall, who, with a Mr. Heetebry, pastor of the Methodist Church at Stittsville, signed as a witness. Mr. Heetebry testified to witnessing the option; that he knew Somers well, was on friendly terms with him, had talked often with him both about religious and temporal affairs, had heard him say that he had made up his mind to sell his land in Missaukee county; that when the option was prepared the parties discussed it together and agreed on the terms; that Somers told Gall what to write, was "perfectly sober, had all his senses, and was in his right mind;" that he was a drinking man and drank often, but was bright, shrewd, and intelligent, and witness had known him to refuse to do any business while he was drinking.

At this time Ferris had leased the hotel and quit the saloon business, and claimed Somers was then owing him near $1,100 for board, loans, bills paid for him, bar bills, etc. .

On January 2, 1907, Somers was convicted before a justice of the peace of using indecent language in the presence of his daughter-in-law and sentenced to the county jail for a term of 90 days. The option he gave Ferris expired without anything being accomplished under it, and on January 4, 1907, Mr. Gall, for Ferris, visited Somers at the jail, with permission of the sheriff, and procured a renewal of the option. Somers unites with the sheriff in admitting that he was then perfectly sober and knew what he was signing and doing.

On January 8, 1907, Ferris visited Somers at the jail, with permission of the sheriff, whom he fully advised of his purpose, to obtain an adjustment or settlement of their accounts, and Somers, desiring to get some papers he had left at Stittsville before doing so, was allowed to go there for them in company with Ferris. They then went over their matters to some extent, but do not altogether agree as to what occurred. As a result of what passed between them, Somers signed a note to Ferris for $800, and agreed to sign a deed of the land he had given an option for. Ferris claims his account, made up of various items for board at the hotel, care and board of horses, bills and notes paid for Somers, a bar bill, etc., amounted to $1,100, which was figured up and agreed to, except the bar bill, amounting to nearly $300, which Somers refused to pay, and that they finally settled on a balance of $800, for which Somers signed a note. Somers denied that they reached any settlement at the jail, but admits that he signed the $800 note, and on January 15, 1907, went, with permission of the sheriff, to the office of his attorneys of record

in this case, who were then attorneys for Ferris, where matters were gone over, and he signed the deed of that date for the two 80-acre tracts. This is the second of the two deeds to set aside which this bill is filed six years later. It is undisputed, and Somers admits, that he was perfectly sober at the time he executed this deed; no deed was then given for the other 160 acres included in the option, because the attorney, who made out the papers, advised that it was not necessary, as Somers had already conveyed the title by his deed of May 4, 1906, and under their agreement it would stand as a sufficient conveyance.

We think it clearly shown that on January 15, 1907, when this deed was signed in the office of reputable counsel, who took Somers' acknowledgment and now represent him, the accounts between these parties were all gone over, discussed, and settled, and the balance due Somers for the land, according to the price fixed in the option, paid into the hands of counsel for him. This money he admits was subsequently paid to and accepted by him. Somers testified that later some figures relating to the settlement were put down in his book in the attorneys' office. This book was produced and put in evidence. Of it he said:

"I thought there was more money coming to me than there was, and I wanted a statement put upon my book, in figures, as the settlement was made. * * * Yes, sir; these are the figures we put on the book. Mr. Miltner made the figures. I think Mr. Ferris and myself were present when they were made. I was there; I am sure of that. * * * These figures follow the settlement, and whatever is down there in figures is just as I and Mr. Ferris settled. For example, I supposed the $197.79 for all taxes, that amount was to be taken out of the $1,950. It was for tax titles and taxes that Mr. Ferris was to pay, and the item of $364.05 was the item for the Torrey mortgage. Mr. Ferris was to pay that mortgage, and that amount was to be taken out of the $1,950, and I think the item of $226.50 was the amount of the

Kelly mortgage. Mr. Ferris was to assume that, and that amount. was to be taken out of the $1,950. I think that note was $850. These figures were put down at my suggestion. I wanted Mr. Miltner to put down the figures just as the settlement was made, and he did that, and these figures represent the settlement just as it was made."

Even eliminating all other evidence in the case, it is impossible, in the light of his own testimony, to regard as of any probative force complainant's broad assertions in support of the allegations in his bill that at this time his brain was diseased, his mind gone; that he had no realization of what he was doing when he signed the $800 note and the deeds; that he then owed defendant nothing, and the instruments were without consideration. None of the witnesses in this case on either side, except Somers himself, testify that when sober he was mentally incompetent or incapable of intelligently transacting business during this period, and most of them testify · positively that when sober he was mentally competent, above the average farmer in shrewdness and business ability, and amply capable of understandingly transacting business. The testimony is conclusive that, when he executed these deeds, signed the option, and made this settlement, he was perfectly sober and fully understood what he was doing.

It is clearly shown that complainant had frequently drank to excess for several years, and that his excesses increased as he indulged his growing appetite for drink, until his business was almost totally neglected and he sank into a common drunkard. Though he sometimes patronized other saloons, the hotel bar at Stittsville was his favorite and habitual resort, not only while defendant ran it but before and after. That he was ruined by drink, morally and financially, is clearly shown, and as usual the barkeeper was his friend while his money lasted. That

182 Mich.—26.

Ferris, while in the business, and for profit, made him welcome, indulged and encouraged him in his dissipations, and in that way contributed to his downfall, is equally manifest. If the issue here was one of comparative moral depravity, the preponderance of evidence as between the two would not be in his favor, but, in a proceeding of this kind, the court is not at liberty to act as a guardian to conserve the property of those disposed to squander it in dissipation. The question is whether these instruments, executed according to legal formalities and acknowledged before reputable attorneys, should be set aside because they were not executed by Somers when he was sober, sane, and competent to transact business understandingly. If he was competent, a court cannot concern itself whether he drove a good or bad bargain, or what he did or had done with his money.

A drunkard is held incompetent to execute a conveyance only upon proof that, "at the time of the act, his understanding was clouded, or his reason dethroned, by actual intoxication." *Wright* v. *Fisher*, 65 Mich. 275 (32 N. W. 605, 8 Am. St. Rep. 886).

Complainant's claim of inadequacy of price as proof of fraud is not well established by a preponderance of evidence. It is shown that in the intervening years the property has increased in value, both with the general increase in the price of land in that section and by substantial improvements which have been made upon it; but as applied to its market value when the option was given on November 2, 1906, though some witnesses testify to higher values than Ferris paid, other apparently disinterested witnesses, neighboring farmers living in that vicinity, lumbermen and land dealers who had bought and sold such land in that locality, to some of whom complainant had offered part of this land for less, testified to a then fair market value, estimating it by the acre and otherwise,

closely approximating the price stated in the option to Ferris.

Where the transaction was fully consummated years before, as here, the court will inquire no further into the adequacy of consideration than to ascertain if the price paid was so grossly inadequate as to shock the conscience and necessarily imply fraud. The evidence in this case does not establish that fact.

Complainant waited six years before electing to disaffirm the conveyances, and taking steps to have them set aside. Conceding the prejudicial significance of the fact that the settlement was obtained by Ferris, and the last steps taken in this transaction were when Somers was in jail serving a sentence for an offense committed while he was intoxicated, he was at least sober then and remained so until discharged the 2d of April thereafter. In excuse of his delay in bringing this suit, he testifies:

"Why, I had been drinking afterward, then finally began to realize what I had done and where my property had gone to, and then—I began to realize what had been done to me last summer some time. Yes, that was after I had stopped drinking and recovered my mental faculties to some extent."

It was shown that shortly after his discharge from jail, on April 2, 1907, he deeded this land to his son-in-law, Leonard Courter, without the latter's knowledge or consent, who, on being advised of the fact by one of Somers' present counsel, and at his suggestion, gave a quitclaim deed of the same to Ferris. Of his motive in making this conveyance, Somers says:

"I deeded the land to Mr. Courter, my son-in-law, because I got to thinking it over and concluded that he had taken advantage of me, and I believe I gave him the $800 before that, too."

When asked on cross-examination if "last summer" was the first time he concluded he had been taken advantage of, he answered:

"No, I had thought of it ever since I gave that quitclaim deed to Mr. Courter. Yes, I knew of it all the time; just exactly what I knew when I filed this bill. I guess so.   *   *   *   I knew from January 15, 1907, up to the time I filed this bill on the 6th of October, 1912, that I had deeded the lands to Mr. Ferris, and I knew he was in possession of the lands."

No offer of restitution is shown to have been made in this case. Aside from the liquidation of his $800 note, which he disputes, complainant knew Ferris paid a mortgage upon the land of $364.05, together with taxes and tax titles approximating $400, and he received $309.16 in cash after he was released from jail, as well as seeing over $500 expended in improvements upon the property. His act in quitclaiming to his son-in-law shortly after his deed to defendant Ferris, and his own admissions as to what he knew and thought, show a realizing sense at that time of all he claims now.

In *Sanderson* v. *Adams,* 133 Mich. 359 (94 N. W. 1063), where complainant sought to have set aside a conveyance made while in custody charged with the murder of her husband, terrorized by the situation and her mental capacity so impaired, as was claimed, that she was unable to act understandingly, and the conveyance therefore was not her free act and deed, this court said:

"On August 5, 1899, she was not in custody.   *   *   *   She   *   *   *   knew the fact (if fact it was) that that bargain was made when her state of mind deprived her of the capacity to make it.   *   *   *   If she had a right at this time to disaffirm the contract, she had a right to affirm it, and, when she accepted and appropriated its proceeds she made an election which for all time affirmed it."

In *Bumpus* v. *Bumpus,* 59 Mich. 95 (26 N. W. 410), it is said:

"The general rule is, where fraud is charged, that it must be clearly proved as alleged, and is not to be

lightly inferred, and the party affected by it must complain promptly when the facts come to his knowledge."

The fact, if it was a fact, that complainant had been defrauded, induced to make this settlement and sign the instruments at a time when his state of mind deprived him of the capacity to do so understandingly, came to his knowledge in April, 1907, according to his own testimony, and continued to be to his knowledge until he filed this bill, without offer of restitution, in October, 1912.

We are impelled to the conclusion that complainant was perfectly sober and in his right mind when he signed the instruments attacked, and is also precluded by laches from at this time questioning them.

For the reasons stated, the decree of the lower court must be reversed, and complainant's bill dismissed, with costs.

McALVAY, C. J., and BROOKE, KUHN, STONE, OS-TRANDER, BIRD, and MOORE, JJ., concurred.