BOEREMA *v.* JOHNSON.

1. APPEAL AND ERROR—CHANCERY CASES—DE NOVO REVIEW.

An appeal from decree dismissing executors' bill to set aside deed given by decedent to defendant on ground of fraud, undue influence and mental incompetency is heard by the Supreme Court *de novo* on the record.

2. DEEDS—SETTING ASIDE—FRAUD—UNDUE INFLUENCE—EVIDENCE.

Record in suit to set aside deed by decedent widower to landlady where he had roomed most of the time following his wife's death *held,* without direct proof of fraud or undue influence on part of defendant grantee.

3. SAME—MENTAL COMPETENCY—EVIDENCE.

Trial court's finding that elderly grantor widower was of sound mind at time he executed deed of cottage property some 6 months before he died, which deed his executors seek to have set aside, is not disturbed under record showing deceased had never been committed or subjected to guardianship, that while his consumption of beer was frequent and in some quantity, the testimony as to his condition at time of the execution of the deed was not such as to cause the Supreme Court to reverse the trial judge.

4. SAME—OLD AGE—ADDICTION TO ALCOHOL—MENTAL COMPETENCY.

Proof of old age and alcoholic addiction, standing alone, do not constitute proof of incompetence to execute a deed.

5. SAME—MENTAL COMPETENCY—INTOXICATING LIQUORS.

Mental incompetency to execute a deed, claimed to be due to addiction to alcohol, must be shown to have resulted from actual intoxication clouding his understanding or dethroning his reason at the time of executing the deed.

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 3 Am Jur, Appeal and Error § 815.
[2] 9 Am Jur, Cancellation of Instruments § 63.
[3–5] 16 Am Jur, Deeds § 85; 28 Am Jur, Insane and Other Incompetent Persons §§ 67, 72, 135, 136.
[6] 9 Am Jur, Cancellation of Instruments §§ 24, 25.

6. Same—Overreaching—Fraud—Consideration.

 The Supreme Court scrutinizes carefully the transactions between strangers and the aged and infirm, where no consideration or inadequate consideration is shown, and will intervene to set aside a deed, if overreaching or fraud is proved or reasonably implied.

7. Same—Widower's Landlady—Stepgranddaughter.

 Deed by elderly widower to defendant, his landlady of some 2 or 3 years following death of his wife, is not set aside at suit of executors and his stepgranddaughter, where deceased had left them both substantially more than his relationship with either or the services provided him by either would normally call for.

Appeal from Leelanau; Brown (Charles L.), J. Submitted April 8, 1959. (Docket No. 19, Calendar No. 47,787.) Decided October 13, 1959.

Bill by John Boerema and David Thomasma, executors of the estate of John G. Holden, deceased, and Geraldine Glynn against Belva Johnson to set aside deed. Bill dismissed. Plaintiff appeals. Affirmed.

*Linsey, Shivel, Phelps & Vander Wal* (*Leland D. Phelps,* of counsel) and *James Fitzpatrick,* for plaintiffs.

*Charles H. Menmuir* and *Glenn Aylsworth,* for defendant.

Edwards, J. This is an appeal in chancery from the order of a circuit judge, entered after hearing, dismissing a bill of complaint to set aside a deed. The deed was given by one John Holden, now deceased, to defendant-appellee Belva Johnson, his landlady in the last 2 years of his life. Plaintiffs-appellants are the 2 executors and the residual legatee of his estate under a will executed prior to the deed in question. The bill of complaint

claimed the deed was void because of fraud, undue influence and mental incompetence on the part of decedent.

This being a chancery appeal we, of course, hear it *de novo* on the record. The only question is whether plaintiffs sustained the burden of proof as to the grounds alleged for setting the deed aside.

John Holden was born in Belfast, Ireland, in 1878. He died September 14, 1955, in Leelanau county, Michigan where he had lived most of his 77 years. By the time of his death he had outlived most of his close relatives and he had accumulated a modest estate.

For many years Holden and his wife operated a resort at Burdickville on Glen lake in Leelanau county consisting of cabins, a gasoline station and a dining room and tavern where wine and beer were sold. In 1945 the Holdens sold their resort and moved to Grand Rapids. They invested the proceeds of the sale in land contracts. Mrs. Holden died in 1952 in Grand Rapids and the following year John Holden moved back to Leelanau county.

He left his Grand Rapids affairs in the hands of an attorney, who had a power of attorney and made collections and transacted business generally for him. In 1953 the attorney turned Holden's affairs over to 2 Grand Rapids men who owned cottages at Glen lake, John Boerema and David Thomasma, plaintiffs herein and executors under the will.

Holden had a habit which was at least partly responsible for this power of attorney arrangement. He was very fond of beer. Indeed there is testimony that for the last 20 years of his life he rarely went a day without consumption of that beverage in some quantity. It appears that this habit made him something of a spendthrift.

After Holden went back to Leelanau county in the winter of 1953-1954 he roomed with a Mr. and

Mrs. Charles Johnson. The testimony indicates that by then he was an object of some pity. His clothing was dirty; he frequently wet himself; he was old and lonely; he drank too much beer.

There is no dispute but that Mr. and Mrs. Johnson were good to him—that Mrs. Johnson got him cleaned up and that Mrs. Johnson and some other ladies took him out occasionally.

It appears that toward the end of his life Holden had much advice about the disposition of his property—much of it conflicting.

At the urging of his relatives and of John Boerema on January 2, 1954, Holden made a will. The will made appellant Geraldine Glynn residuary legatee. It contained no other bequests. The will said specifically:

"It is particularly my desire that she receive my cottage at Glen lake, Michigan, if the condition and circumstances of my estate will permit."

Mrs. Glynn was the granddaughter of Mrs. Holden by another marriage and had lived with the Holdens while she was growing up. When she married and moved to Grand Rapids she saw little of John Holden. She did not want him around her children when he was drinking. This apparently precluded much contact.

On June 21, 1954, Holden gave a deed of property to Harold Holden, a nephew. On August 10, 1954, he gave another deed to J. Scott Moore, another nephew.

On March 28, 1955, Holden went to the courthouse at Leland and signed a deed to defendant Belva Johnson for the Glen lake cottage. There was no monetary consideration.

Much testimony was presented by the parties as to John Holden's condition that day. The register of deeds who drew the deed at Holden's instruction

testified that Holden knew what he was doing, that he recited the lot and block number of the property from memory and that, "he didn't appear to be any different than any other time that I ever saw him." On the other hand Emelia Schaub, an attorney who saw him at the courthouse that day thought that he was under the influence of intoxicating liquor.

There is also much testimony about what John himself said about the day in question. One of his advisers, a Mrs. Salzwedel, reported him to have said that he was drunk and didn't know what he had done that day. To John Boerema he denied that he could remember the whole affair. One of his cronies however reported him as saying that he had "willed" the cottage to Belva Johnson because "they have been awful good to me."

In each of these conversations what Holden said about the giving of this deed appears directly related to the interest of the persons to whom he was talking.

The deed was signed March 28, 1955. John Holden died September 14, 1955. Death was caused by a heart attack and Holden had been up and about until it occurred. In the 6 months which intervened Holden had taken no steps to set the deed aside.

Holden died in the Johnsons' home and the Johnsons made the funeral arrangements. Mrs. Glynn was unable to attend.

On October 20, 1955, Holden's will was offered for probate and Mrs. Boerema testified that on January 2, 1954, when the will was made out in her opinion John Holden was of sound mind.

As of the time of trial Holden's estate as to which Mrs. Glynn is sole heir had assets of approximately $12,000 aside from the cottage property in dispute here.

So much for the facts. Actually none of them are in real dispute. What is in dispute is the de-

duction as to mental competence (particularly on March 28, 1955) drawn from them by various witnesses.

The chancellor who heard the witnesses concluded at the end of the hearing:

"That the record does not in any way show that there was any fraud, duress, undue influence, misrepresentation or overreaching used or practiced by defendant on the deceased in the obtaining of the warranty deed to the property."

We also are unable to find any direct proof of fraud or undue influence and it appears that appellant has abandoned these claims on appeal.

The chancellor also found that the deceased was of "sound mind * * * at the time he executed the deed."

Proofs of old age and alcoholic addiction standing alone do not constitute proof of incompetence. The evidence must show that at the time in question the person's reason was overthrown. The general rule was stated early by this court in *Wright* v. *Fisher*, 65 Mich 275, 284 (8 Am St Rep 886):

"A drunkard is not an incompetent, like an idiot, or one generally insane. He is simply incompetent upon proof that, at the time of the act, his understanding was clouded, or his reason dethroned, by actual intoxication."

See, also, *Somers* v. *Ferris*, 182 Mich 392; *Burns* v. *Misura*, 228 Mich 152.

John Holden had never been committed or subjected to guardianship. He transacted his own affairs (sometimes with assistance, which he himself secured) all of his life. Plaintiffs in this action are acting under and relying on a will executed less than 15 months preceding this deed. In that 15-month period Holden also had sold or deeded other

properties without his competence being challenged. There is no convincing showing that Holden's general condition had changed materially as of March of 1955.

As to the day in question when the deed was made out we have pointed to a conflict of testimony as to whether or not Holden was intoxicated. The only witness who had testified to Holden's being under the influence of liquor on the day the deed was given was Emelia Schaub, an attorney. The chancellor's interest in Holden's condition on that day produced this significant question and answer:

*"The Court*: But he could seem to talk sensibly and rationally when he didn't have too much, or could you tell? Did you know him well enough to know that?

*"The Witness*: Well, I haven't thought that over. Let's see, I just can't remember. It just seemed to me he always was just like that; but I don't know that he ever talked in a way that wouldn't be rational. I don't remember such an occasion as that."

This Court generally views with a jaundiced eye the transactions between strangers and the aged and infirm where no consideration or inadequate consideration is shown. And where overreaching or fraud is proved or reasonably implied we will not hesitate to intervene. *Noban* v. *Shoup*, 171 Mich 191; *Wagbo* v. *Smiseth*, 227 Mich 313.

We do not see this as such a case. Holden was old and probably much too fond of beer—but we believe there is no proof direct or implied that his reason was overthrown.

This is a contest between Holden's step-granddaughter and his former landlady over the disposition of a cottage. The truth of the matter is that John Holden left both of them substantially more than his relationship with either or the services

provided him by either would normally call for. But this record discloses no more logical objects of his bounty. We believe (as did the chancellor below) that John Holden knew exactly what he had done—and intended it that way all the time.

Affirmed. Costs to appellee.

DETHMERS, C. J., and CARR, KELLY, SMITH, BLACK, VOELKER, and KAVANAGH, JJ., concurred.