408 P.2d 462

**Marvin F. OLSEN and Mercedes Olsen, Plaintiffs-Respondents,**

v.

**Charles E. HAWKINS and the Equitable Life Assurance Society of the United States, a corporation, Defendants,**

and

**Charles E. Hawkins, Appellant.**

No. 9490.

Supreme Court of Idaho.

Nov. 22, 1965.

Rehearing Denied Dec. 21, 1965.

Sharp, Anderson & Bush, Idaho Falls, for appellant.

McDevitt & McDevitt, Pocatello, for respondents.

KNUDSON, Justice.

Under date of January 1, 1953, Hobart A. Turner (hereinafter referred to as Turner), while an employee of the Union Pacific Railroad Company (hereinafter referred to as the Railroad), procured a life insurance policy upon his own life from defendant, The Equitable Life Assurance Society of the United States, in the amount of $3,500.00. Myrl L. Turner, his then wife, was named therein as beneficiary. Mrs. Turner died during 1956.

Under a written change of beneficiary which became effective January 9, 1957, respondents were designated as beneficiaries under the policy. Respondents are husband and wife and respondent Marvin F. Olsen was Turner's stepson. Thereafter and pursuant to the request of Turner, another written change of beneficiary was is-

sued wherein Turner designated appellant Charles E. Hawkins as beneficiary under said policy effective as of March 17, 1960.

Turner died November 13, 1962. Respondents commenced this action seeking to recover the amount payable under the insurance policy. The trial court, sitting without a jury, concluded that the change of beneficiary executed in behalf of Charles E. Hawkins was made while the said Turner was incompetent and unable to transact his business or to understand the nature of the transaction, and was void. Appellant contends that there is no competent evidence to sustain the action of the trial court in so holding.

▉▉ We approach this case with full recognition of the long established rule of this court that our province is to examine the record in the light most favorable to the judgment and that when findings of the trial court are supported by competent substantial evidence they are binding and conclusive on appeal. Summerfield v. Pringle, 65 Idaho 300, 144 P.2d 214; Shepard v. Smith, 74 Idaho 459, 263 P.2d 985; Dunclick, Inc. v. Utah-Idaho Concrete Pipe Co., 77 Idaho 499, 295 P.2d 700.

In order that respondents' contentions may be clearly understood, the following allegation is quoted from their complaint, to-wit:

"V.

"That thereafter and on or about March 17, 1960, while the said insured HOBART A. TURNER was under the effects of alcoholism and while the said HOBART A. TURNER was without control of his own faculties, and by fraud, misrepresentation and coercion, and with the promise of furnishing him a few dollars for the purpose of procuring liquor, the defendant CHARLES E. HAWKINS procured from the said HOBART A. TURNER the execution of a change of beneficiary on the said policy; that no consideration existed or does exist for such change, that no relationship constituting a beneficial interest existed or exists between the said CHARLES E. HAWKINS and the said HOBART A. TURNER."

The proof does not establish, and the court did not find, that any fraud, duress, misrepresentation, overreaching or undue influence was used or practiced by appellant on the deceased in connection with obtaining the change of beneficiary being challenged. The only question presented for our determination is whether respondents sustained the burden of proof in support of their charge that Turner was mentally incompetent to execute the change of beneficiary on the policy effective as of March 17, 1960.

Several rules of law are applicable to the case at bar and must be considered during our review of this record. It is a fundamental rule that the law will presume sanity rather than insanity, competency rather than incompetency; that every man is capable of managing his own affairs and responsible for his own acts. Likewise it is presumed that each man is capable of understanding the nature and effect of his contracts.

It may also be stated that as a general rule, all proceedings involving the competency of an individual to execute a valid contract start with the presumption of competency and that this presumption may be relied upon until the contrary is shown. 29 Am.Jur., Insane Persons, § 132, p. 253. Since the presumption is in favor of capacity to contract, he who asserts the incapacity of a person to contract has the burden of proof. 17A C.J.S. Contracts § 584b, p. 1124.

A rule to be applied in cases of this kind is well stated in 17 C.J.S. Contracts § 133(1)e, p. 860, that:

"The test of mental capacity to contract is whether the person in question possesses sufficient mind to understand, in a reasonable manner, the nature, extent, character, and effect of the act or transaction in which he is engaged; the law does not gauge contractual capacity by the standard of mental capacity possessed by reasonably prudent men. It is not necessary to show that a person was incompetent to transact any kind of business, but to invalidate his contract it is sufficient to show that he was mentally incompetent to deal with the particular contract in issue, * * *."

In the instant case Turner was described by some as being "forgetful and childish." This expression was not further defined. However, a reasonable interpretation of it would be that they did not consider Turner as possessing the mental capacity of the average man of his age. In this connection it should be noted that where a person possesses sufficient mental capacity to understand the nature of the transaction and is left to exercise his own free will, his contract will not be invalidated because he was of a less degree of intelligence than his co-contractor; because he was fearful or worried; because he was eccentric or entertained peculiar beliefs; or because he was aged or both aged and mentally weak. Page v. Prudential Life Ins. Co. of America (1942), 12 Wash.2d 101, 120 P.2d 527.

Of particular significance to this case is the general rule as stated in 29 Am.Jur., Insane Persons, subtitle, Habitual Drunkenness, § 85, p. 206, as follows:

"Clearly, a person's dissipated condition is not in itself a ground for avoid-

ing a contract or deed, since it is well known that while habitual drunkards are, at times, mentally infirm to the same extent as an insane person or an idiot, at other times they are sober and rational. Accordingly, the rule is that in the absence of an adjudication finding a habitual drunkard to be incompetent, in order to avoid his contract or deed on the ground of his incompetency, it must be shown that his mental condition was such, at the time the contract or deed was made, that he lacked the power of reason and was unable to comprehend the nature and consequences of his act in entering into the contract or executing the deed. A deed executed in a sober interval by one who is addicted to the excessive use of liquor, but who has not been adjudicated incompetent and has not suffered a permanent impairment of mind as a result of his excessive indulgence, will stand, at least in the absence of undue influence or fraud."

The evidence submitted in support of respondents' allegations and contentions may be briefly summarized as follows:

Prior to the death of Turner's wife, they, the Turners, lived at Montpelier, Idaho, and they frequently visited respondents, who lived at Pocatello, Idaho. Mrs. Turner died in November 1956. At that time Turner was a retired railroad engineer, receiving two pensions totaling approximately $250.00 a month; that following the death of Mrs. Turner he became a "heavy drinker" and was what may be termed an alcoholic during a substantial portion of the years that followed; that on a number of occasions while he was under the influence of intoxicating liquor he was arrested for various offenses, among which were, being drunk in a public place, driving while drunk and indecent exposure, and was finally committed to the State Hospital South as an alcoholic.

The record shows that following the death of his wife Turner moved to Lava Hot Springs sometime during December 1956 and it was during 1957 when he became involved in most of the arrests hereinbefore mentioned. During May 1957 he voluntarily entered said State Hospital, at which time "he was diagnosed as a case of Chronic Alcoholism," and remained at the hospital about two weeks. Thereafter and on October 24, 1957 he was readmitted to the hospital under a judicial order and the same diagnosis was given him. On May 1, 1958, he was discharged from the hospital. In a report issued under the signatures of the staff physician and the superintendent of the hospital (Plfs.Exh.D), it is stated that "his stay here was uneventful and no particular treatment was considered necessary although he attended group therapy without much benefit."

Following his discharge from the hospital Turner remained in the city of Blackfoot for three or four months, following which he moved to Ashton, Idaho, where he remained for several months. It was during his stay in Ashton, and on or about March 17, 1960, that the change of beneficiary here involved was accomplished.

This brings us to a consideration of one of the principal issues presented, namely, does the record disclose competent evidence in support of the court's finding that the change of beneficiary was made while Turner was incompetent and unable to transact his business or understand the nature of the transaction.

There is no evidence that his incompetency was due to insanity in any form. In fact the record specifically refutes the existence of such condition. In appellant's Exhibit D, hereinbefore referred to, it is specifically stated that at no time during Turner's stay at the State Hospital South was he considered to be psychotic.

Although the court did not specifically state in its findings the cause of Turner's incompetency, the only fair and reasonable construction to be given the finding is that his incompetency was the result of excessive use of alcoholic liquor over an extended period. However, a contract by an alcoholic may not be avoided on that ground alone if at the time of its execution he was sober and in the posses-sion of his faculties. Proofs of old age and alcoholic addiction standing alone do not constitute proof of incompetency. The evidence must show that at the time of the act his understanding was clouded or his reason dethroned by intoxication or its effects. Boerema v. Johnson (1959), 357 Mich. 433, 98 N.W.2d 596.

In Crawford v. Crawford (1954), 176 Kan. 537, 271 P.2d 240, the court had under consideration a similar issue where the evidence clearly established that on numerous occasions, both before and after the day in question, Crawford (who executed the deed in question) was undergoing treatment for mental and physical disorders allegedly brought on by excessive use of alcoholic liquor over a period of years, and the court said:

"However, assuming that evidence to be true, the matter still resolves itself into the precise question whether *at the time he signed the deed* Crawford was competent to understand the nature of the transaction."

See also Curry v. Stewart (1962), 189 Kan. 153, 368 P.2d 297; Page v. Prudential Life Life Ins. Co. of America, supra.

This court has also stated that:

"Whether a contracting party has sufficient mental capacity to enter into a valid contract is a question of fact to be determined by the trier of the facts *as of the time of the transaction.*"

(emphasis supplied) Miller v. Miller, 88 Idaho 57, 396 P.2d 476.

Respondents did not introduce any substantial evidence tending to disclose Turner's mental or physical condition between the time he moved to Ashton (Sept. 1958) and September 1960. In fact respondent Marvin Olsen testified that he did not see Turner while he was living at Ashton. The only evidence regarding Turner's condition during the period of several months both before and after March 17, 1960 was submitted by appellant and three witnesses called by him. Two of said witnesses were employed by the railroad in the capacity of telegrapher-cashiers and the other as a roadmaster clerk. Their testimony may be briefly summarized as follows: They frequently saw and visited with Turner while he lived in Ashton; most of such visits were had at the railroad depot, although one testified that he had had Turner in his home, had visited him in his own apartment and on occasions had gone fishing with him; that he appeared neatly dressed and well-mannered; that he visited and conversed in a normal manner and they were not aware of any addiction he may have had for alcoholic drink. They regarded him as entirely competent; that Turner mentioned to each of them he had changed the beneficiary and to some he stated his reason for so doing. One witness testified that he was requested to and did witness the execution by Turner of the change of beneficiary form and that Turner seemed perfectly normal at that time.

Appellant also testified that at the time the assignment was made he was depot agent for the railroad at Ashton; that he had known Turner for several months prior to March 1960; that he, Turner, would come to the depot office almost each day; on a few occasions he had talked with Turner at Legion meetings and went fishing with him once; that the first time Turner mentioned anything to him about changing the beneficiary on his insurance policy was about the middle of January 1960, which occasion occurred at the depot and was described by appellant as follows:

"Q All right. Then the two of you were present, and will you tell us as best you recall what was the conversation?

"A Well, he showed me a letter from the railroad accounting department that said that he was about six months behind on his premiums with his group insurance, and he told me that he had tried to get his stepson to take over this policy and pay the premiums on it, and bury him. He said all he was interested in was to be buried with his wife; she was buried in Pocatello, but he said his stepson, he didn't get along good with him, and he couldn't really trust him and he wouldn't do it for him, and he wanted to know if I

would accept the responsibility to pay the premiums in order to collect this insurance."

This testimony of appellant and his witnesses regarding Turner's mental and physical condition at and near the time when the assignment was accomplished is uncontradicted. This court has consistently held that such testimony cannot be arbitrarily disregarded. In National Ro-Tile Corporation v. Loomis, 82 Idaho 65, 350 P.2d 217, the court quoted with approval the following statement:

" 'The rule applicable to all witnesses, whether parties or interested in the event of an action, is, that either a board, court, or jury must accept as true the positive, uncontradicted testimony of a credible witness, unless his testimony is inherently improbable, or rendered so by facts and circumstances disclosed at the hearing or trial. Manley v. Harvey Lumber Co., 175 Minn. 489, 221 N.W. 913, 914. In Jeffrey v. Trouse, 100 Mont. 538, 50 P.2d 872, 874, it is held that neither the trial court nor a jury may arbitrarily or capriciously disregard the testimony of a witness unimpeached by any of the modes known to the law, if such testimony does not exceed probability. And, in Arundel v. Turk, 16 Cal.App.2d 293, 60 P.2d 486, 487, 488, the rule is stated thus: "Testimony which is inherently

improbable may be disregarded, * * but to warrant such action there must exist either a physical impossibility of the evidence being true, or its falsity must be apparent, without any resort to inferences or deductions." ' "

See Pierstorff v. Gray's Auto Shop, 58 Idaho 438, 74 P.2d 171.

Under the facts disclosed by this record it cannot be said that the testimony of such witnesses is inherently improbable. In this connection it is proper to note that prior to the time respondent caused Turner to be committed to the State Hospital South by judicial order on October 24, 1957, he, Turner, had quite frequently called at respondents' home, and sought their aid and companionship. However, during the interval intervening the date of his release from the hospital (5-1-58) and his death (11-13-62) he called at respondents' home only twice, one of which was to obtain his TV and personal effects, at which time he was sober. Respondents acknowledge that during said period they saw him approximately three times; that they did not see him at all during 1960.

Appellant's witnesses also testified that he, Turner, had stated to them that he was not satisfied with respondents' handling of the insurance; that he refused to stop to see respondents while he was in Pocatello and did not speak very highly of them. Whether Turner felt any resentment toward

his stepson for causing him to be committed to the hospital is not disclosed; however, there is no contradiction of the foregoing mentioned testimony of appellant's witnesses. It is true that appellant's evidence regarding Turner's demeanor is in contrast to that introduced by respondents. Nevertheless, it is undisputed that Turner moved to Ashton within a comparatively short time after spending approximately seven months in a hospital where no liquor was available to him

We have not overlooked the fact that respondents also introduced substantial evidence to the effect that commencing with September 1960 and continuing to his death, Turner reverted to his former addiction. In short, we have presented to us by the evidence in this case a man whose conduct prior to and after execution of the instrument here in question, was peculiar to say the least, but the sum and substance of the testimony indicates only that his trouble was caused by intoxication.

Applying the foregoing stated rule to the facts disclosed in this case, appellant's uncontradicted evidence regarding Turner's mental condition at the time the assignment was being considered and accomplished by him cannot be disregarded.

We find no substantial evidence in the record to support the finding by the court that Turner was incompetent at the time of making the assignment involved. The judgment is reversed.

It being just and equitable that respondents should be reimbursed the amount which they have paid from their own funds as premiums on the policy here considered, and since the record before us does not disclose the amount of such advances, the cause is remanded to the trial court with instructions to conduct a hearing at which the court shall receive and consider such evidence as is properly submitted tending to establish the total of such advances. Upon determining the amount thereof the court shall enter judgment directing the clerk of the court to pay such amount to respondents from the $3,500.00 on deposit and the remainder thereof to appellant. The judgment shall further direct that appellant promptly pay therefrom the funeral costs and expenses of the last illness of Mr. Turner.

Costs to appellant.

McQUADE, C. J., and McFADDEN, TAYLOR and SMITH, JJ., concur.