529 P.2d 765

Thomas L. RUSS and Lydia R. Russ, husband and wife, Plaintiffs-Appellants,

v.

Floyd F. BROWN and Jetta Brown, husband and wife, Defendants-Respondents.

No. 11055.

Supreme Court of Idaho.

Dec. 17, 1974.

Elam, Burke, Jeppesen, Evans & Boyd, Boise, for plaintiff-appellants.

Derr, Derr, Walters & Cantrill, Boise, for defendant-respondents.

BAKES, Justice.

This litigation arises out of a dispute over a land sale contract. Plaintiff-appellants Thomas and Lydia Russ, the vendees, brought this action against defendant-respondents Floyd and Jetta Brown, the vendors, to rescind the contract claiming misrepresentations made by the Browns concerning several matters, including the water rights on the property. The district court, sitting without a jury, entered judgment in favor of the vendors-Brown and allowed them to retain the amount paid on the contract by the vendees-Russ as the liquidated damages. We reverse the judgment of the trial court.

The Browns owned a bar-cafe and lodge complex known as the Wagontown Lodge located along the South Fork of the Boise River in Elmore County. In August, 1969, they entered into negotiations and ultimately a contract with the Russes for the

sale of Wagontown Lodge to the Russes for the sum of $45,000. The Russes paid $8,050 down and monthly installments of $236.12 from October, 1969, through August, 1970. During the negotiations, certain representations were made by the Browns regarding water rights from Grouse Creek and a ditch right to transport water over a neighboring property. That neighboring property, known as Paradise Plunge, is a similar commercial type property located across the road from the subject property.

On August 31, 1970, the day before an additional $5,000 payment was due, the Russes gave notice that they were rescinding the contract. They tendered the property back to the Browns and demanded the return of their $8,050 down payment. The Russes subsequently brought an action in district court seeking rescission of the contract and the return of their down payment. The Russes' complaint alleged misrepresentation by the vendors which induced the vendees to enter into the contract of purchase. Those alleged misrepresentations concerned the average net income of the business, the acreage contained in the real property, the condition of the lodge equipment and the water and ditch rights for irrigation and domestic use. On appeal, plaintiffs abandoned all of the contentions in their complaint except that portion relating to the water rights.

█ The question presented on this appeal is whether the evidence sustains the trial court's finding that there were no misrepresentations made by the Browns to the Russes concerning water rights on the Wagontown Lodge property. In this regard, it is established in this jurisdiction that, regarding the sale of property, although one may not be required to make representations regarding his property, once undertaking to do so he must fully disclose. This Court in Janinda v. Lanning, 87 Idaho 91, 390 P.2d 826 (1964), cited with approval the following statements:

"The rule decisive of the issue is stated in Restatement of Contracts, sec. 472, Comment b (1932):

"'* * * if a fact known by one party and not the other is so vital that if the mistake were mutual the contract would be voidable, and the party knowing the fact also knows that the other does not know it, non-disclosure is not privileged and is fraudulent.'

"And in Pashley v. Pacific Electric R. Co., 25 Cal.2d 226, 153 P.2d 325 (1944), quoting 12 R.C.L. § 71, p. 310, it is stated:

"'Even though one is under no obligation to speak as to a matter, if he undertakes to do so, either voluntarily or in response to inquiries, he is bound not only to state truly what he tells but also not to suppress or conceal any facts within his knowledge which will materially qualify those stated. If he speaks at all he must make a full and fair disclosure.'" 87 Idaho at 96–97, 390 P.2d at 829.

See also Shrives v. Talbot, 88 Idaho 209, 398 P.2d 448 (1965). The Court in *Janinda* continued by citing Obde v. Schlemeyer, 56 Wash.2d 449, 353 P.2d 672 (Wash. 1960), which quoted the following excerpt from Keeton, Fraud-Concealment and Non-Disclosure, 15 Tex.L.R. 1 *et seq.* (1936):

"'"It is of course apparent that the content of the maxim 'caveat emptor,' used in its broader meaning of imposing risks on both parties to a transaction, has been greatly limited since its origin. When Lord Cairns stated in Peek v. Gurney, that there was no duty to disclose facts, however morally censurable their non-disclosure may be, he was stating the law as shaped by an individualistic philosophy based upon freedom of contract. It was not concerned with morals. In the present stage of the law, the decisions show a drawing away from this idea, and there can be seen an attempt by many courts to reach a just result in so far as possible, but yet maintaining the degree of certainty which the law must have. The statement may often be found that if either party to a contract of sale conceals or suppresses a material

fact which he is in good faith bound to disclose then his silence is fraudulent.

"'"The attitude of the courts toward non-disclosure is undergoing a change and contrary to Lord Cairns' famous remark it would seem that the object of the law in these cases should be to impose on the parties to the transaction a duty to speak whenever justice, equity, and fair dealing demand it."'" 87 Idaho at 97–98, 390 P.2d at 830.

The record discloses in this case that the Russes talked with the Browns about water and ditch rights appurtenant to the property in question. The vendee Russ testified that Mr. Brown expressly stated that the property had water rights[1] and that nothing was said by Brown regarding other persons adversely claiming the water rights to Grouse Creek.[2] Mrs. Russ testified that both Mr. and Mrs. Brown stated that the property had water and there was no reference made whatsoever about the water or ditch rights being contested.[3] The record on appeal clearly reveals that prior to the time of the sale of the Wagontown Lodge property to the Russes there was a dispute over the Grouse Creek water that fed the well and was used for irrigation on the Wagontown Lodge grounds, and that the Browns failed to reveal this dispute when negotiating the sale of the property. In 1966, the owners of the property across the highway from the Wagontown Lodge, through which the Wagontown Lodge's access crossed, diverted all of the water out of Grouse Creek in order to cool the water in their hot water swimming pool. This diversion interfered with the water flowing down the ditch to the Wagontown Lodge. Thereafter, the property across the highway was sold to one Willis Carrie who claimed water rights for that property in Grouse Creek adverse to the rights of the Wagontown property. In December, 1969, in the process of building a new road across his property, Carrie plowed out the ditch across the property which furnished water to the Wagontown property. The record indicates that both Carrie and his predecessor had at times contested the rights of the vendors Brown to maintain that ditch. (Brown Depo., p. 40). These disputes as to the water and ditch rights were known to the vendor Floyd Brown prior to selling his property to the vendees, Russes.

By his own admission in a deposition taken May 11, 1971, which was admitted

---

1. "Q. Just what was said?
"A. He said that he had the water rights and we had plenty of water and he showed me where the water came across and he said this water runs all the time and this was ours and that the only requirement that I had was to keep the ditch clean and keep it open so the water could flow." (Tr. p. 10).

2. "Q. Prior to the time that you entered into this contract with the Browns, had anyone said anything to you at all about having any water problems?
"A. No.
. . . .
"Q. In fact, weren't you informed that the water had been used over that property for around 50 or 60 years?
"A. I did.
"Q. I believe Mr. Brown was the one that told you that.
"A. That is right.
"Q. Do you know of your own knowledge if any steps were ever taken by anybody concerned in this lawsuit or this sale to correct the water problems to make sure water rights are given to whoever has an interest in that property?
"A. No, I do not." (Tr. pp. 40–41).

3. "Q. What, if anything, was said with reference to the water for the property?
"A. We had water.
"Q. And who told you that?
"A. They both did, Mr. and Mrs. Brown.
"Q. Was there anything said with reference to there being a contest on the water rights?
"A. No, not at the time we were discussing buying the place. There was no contest mentioned whatsoever.
"Q. When did you first learn that there was a contest on the water?
"A. When my husband sent word that the water had been cut off and to get in touch with Mr. Brown.
. . . .
"A. Did they advise us we didn't have the right? No. They said we had the right to the water. We had water.
"Q. Through that ditch?
"Q. Right." (Tr. pp. 60, 65).

into evidence, vendor Floyd Brown admitted that the Russes inquired as to water rights on the property[4] and that he told the Russes that they had rights to the water from Grouse Creek.[5] Although Brown admitted that he told the Russes that water had been running through that ditch for at least "60 years, and that it had established its own right," Brown was not certain whether he had told the Russes that he had had some difficulty with the water rights in question.[6] Brown stated that although he may have discussed water rights with the Russes he could not be certain in what detail, if at all, he discussed the water rights problem.[7] Mrs. Brown testified that while they had had problems with the prior owners of the Paradise Plunge that nothing was said to the Russes about it.[8]

Prior to the Russes' involvement in the Wagontown Lodge property, Willis Carrie and his predecessor interfered with the water rights involved in the present case. In his deposition, Floyd Brown admits that he had discussed the water and ditch problem with both Carrie and Carrie's predecessor on a number of occasions and had supposedly reached an agreement.

Evidence of the existing dispute over the water and ditch rights is further evidenced by the fact that several months *after* the Russes had attempted to rescind the contract Mrs. Brown entered into an easement agreement with Carrie on May 4, 1971. Even though the Russes had attempted to rescind the contract, Mrs. Brown, who was contending that the Russes could not rescind the contract, nevertheless entered

4. "Q. Now, at the time the contract was being written up, and simultaneously with the signing, right before that time, am I correct that my people, the Plaintiffs, talked with you about the water rights in question, they asked you about it?
"A. You say prior to signing the contract?
"Q. That's right.
"A. Yes." (Brown Depo., pp. 40–41).

5. "Q. Well, you did tell them that they had rights to the water from Grouse Crick [sic] and rights to the ditch?
"A. Yes.
"Q. Am I correct, sir, that you gave them the impression that they should not have any trouble with the water rights, that there was sufficient water there to be used for the domestic and irrigation purposes for which they were buying the place?
"A. Yes." (Brown Depo., p. 41).

6. "Q. But yet you still had some problems with Mr. Carrie and his predecessors over that water?
"A. Yes, just because they were jealous competitors.
"Q. Did you ever tell the Russ people before they signed a contract that you had had some problems over the water with Mr. Carrie and his predecessors?
"A. I don't recall for sure whether I did or not.
"Q. To the best of your knowledge, you did not tell them.
"A. For the same token, to the best of my knowledge, I may have.
"Q. Just answer 'yes' or 'no,' sir. To the best of your knowledge you did not tell them?
"Q. I do not know." (Brown Depo., p. 50).

7. "Q. Just answer my question, To the best of your memory, you do not recall telling them about any problems regarding the water rights, you do not recall telling them that?
"A. I am sure we have discussed some of that.
"Q. Here today, sir, in Los Angeles, on South Olive Street, to the best of your memory today, you do not recall telling them about problems that you had had with the water before they signed it?
"A. I am sure I did discuss some part of it, but I am not sure what part or just how deep.
"Q. But today you could not recall telling them that?
"A. I can't recall word for word that part of our discussion, no because it was on several different occasions they were there, and on several different occasions they looked at the ditch, and I am sure we did discuss it, but I am not sure what all was said.
"Q. But you just don't recall telling them that today?
"A. No, I don't. I don't recall it." (Brown Depo., p. 51).

8. "Q. Do you recall informing the Russes of this situation?
"A. No, I don't. I don't recall it personally.
"Q. How long was the water off on this situation with Mr. Nelly? [The owner of Paradise Plunge prior to Mr. Carrie].
"A. Gee, I don't remember. A month.
"Q. What time of the year?
"A. It was late August or the first of September." (Rptr.Tr., p. 117.)

into a ditch easement agreement, an act inconsistent with her position that the Russes were bound on the contract. Contrary to the trial court's ruling that this agreement settled the water dispute, the agreement did nothing to settle the dispute over the water rights but was merely an agreement for the creation of an easement permitting water to be carried from Grouse Creek over Carrie's property to the Wagontown Lodge property. This agreement pointedly demonstrates that a serious dispute existed which the Browns knew of, but which they failed to disclose to the purchasers. The record clearly discloses the presence of an existing dispute over water and ditch rights to the water in Grouse Creek prior to the Russes becoming involved in negotiations to purchase the Wagontown Lodge property. Under the disclosure doctrine of Janinda v. Lanning, *supra*, the sellers had a duty to fairly and fully disclose to the buyers the existence of a contest of the water and ditch rights. The Russes testified that the first time they knew of the water right dispute was when the water was cut off by Mr. Carrie.[9]

This Court has held that the trial court must accept as true the positive, uncontradicted testimony of a credible witness, unless his testimony is inherently improbable or impeached. Hook v. Horner, 95 Idaho 657, 517 P.2d 554 (1973); Olsen v. Hawkins, 90 Idaho 28, 408 P.2d 462 (1965). In the present case the Russes testified that the Browns made no disclosure of the existing water problems and this testimony was not contradicted by the Browns, nor was it impeached. Therefore, the trial court should have ruled as a matter of law that the Browns did not fully or fairly disclose to the purchasers the past and pending water disputes with Mr. Carrie and his predecessors. Under the disclosure doctrine enunciated in Janinda v. Lanning, *supra*, the Browns had a duty, once they embarked upon discussing water rights, to fully and fairly reveal and disclose all the facts, including the problems relating to the water and ditch rights. A reading of the record clearly indicates that the Browns did not reveal or disclose the water and ditch right problem as required by the law as set forth above.

That the Russes relied upon the representations of the Browns regarding water and ditch rights is apparent from their testimony. They were entitled to rely upon the representations of the seller. As stated in Shrives v. Talbot, *supra*:

> "Such findings infer that defendants should not have relied upon statements made by the plaintiffs. However, the rule is otherwise. Plaintiff Shrives may not have been required to speak, but when he did speak it was his duty to state the facts fully and correctly, or to advise defendants that he did not know the facts. As to matters concerning which Shrives did make representations, defendants were under no obligation to make an independent investigation or to inquire of plaintiff's prior tenants." 88 Idaho at 215, 398 P.2d at 451.

The Court also said:

> "In Summers v. Martin, 77 Idaho 469, 295 P.2d 265 (1956), and in Fuchs v. Lloyd, 80 Idaho 114, 326 P.2d 381 (1958), this court again held that it was incumbent upon the vendor to know the truth of the facts of which he spoke, and that the purchaser was entitled to rely upon representations made by the vendor." 88 Idaho at 216, 398 P.2d at 452.

Under the prior cases of this Court, it is not necessary that the failure to fully disclose the water dispute be done with fraudulent intent in order to justify rescission by the vendee. Fuchs v. Lloyd, 80 Idaho 114, 326 P.2d 381 (1958); Summers v. Martin, 77 Idaho 469, 295 P.2d 265 (1956).

Judgment reversed and remanded to the district court with instructions to enter a judgment in favor of plaintiffs for rescission of the contract and return of the $10,646 total consideration which the court found the plaintiffs to have paid. From

9. See footnote 3.

the foregoing the defendants shall be entitled to offset only the following items found by the district court in its memorandum opinion: $578.68 for repair of the premises; $1,800.00 in the reduction of the inventory; and $4,950.00 for the reasonable rental value of the premises for eighteen months. In addition the district court may make such other setoffs or allowances, if any, which the court determines that either party is equitably entitled to as a result of this Court's action in allowing plaintiffs' rescission of the contract.

Costs to appellant.

DONALDSON and McQUADE, JJ., concur.

SHEPARD, Chief Justice (dissenting):

I respectfully dissent from the decision of the majority. It is my belief that the record in this case simply does not sustain the decision of the majority.

Plaintiffs brought the present action seeking rescission of the contract on the basis of alleged misrepresentations by the vendors which induced the vendees to enter into the contract. Those alleged misrepresentations concerned the average net income of the business, the acreage contained in the real property, the good working condition of the lodge equipment, and that there were good and adequate water rights for irrigation and domestic use.

Following trial to the court, findings of fact were entered and the court concluded therefrom that judgment should be entered for the defendants on the basis that there had been a failure to prove all of the elements of fraud by clear and convincing evidence.

It is a long-standing principle of contract law that a purchaser of real property may rescind a contract because of the vendor's fraudulent misrepresentation of material facts. This court has repeatedly held and most recently in Schoenick v. Smalley, 93 Idaho 786, 473 P.2d 928 (1970):

"The essential elements of fraud are (1) a misrepresentation of a material past or existing fact; (2) the untruth or falsity of such representation; (3) the speaker's knowledge of its falsity or ignorance of its truth; (4) his intention that it should be acted upon by the person to whom it is made; (5) ignorance of its falsity on the part of the person to whom it was made; (6) reliance on a representation; (7) his right to rely upon it; and (8) his damage occasioned thereby."

In Shrives v. Talbot, 91 Idaho 338, 421 P.2d 133, this court held that the question of whether alleged fraud had been proved by clear and convincing evidence is solely for the determination of the trier of the fact, and that such determination should not be disturbed on appeal when it is supported by competent and substantial, although conflicting, evidence.

The trial court determined on the basis of substantial, although conflicting evidence, that the Russes had failed to sustain their burden of proving by clear and convincing evidence the essential elements of: 1) misrepresentation of a material fact; 2) misrepresentation of a material past or existing fact; and 3) the intention that it should be acted upon by the person to whom it was made. It may further be questioned on the record before us whether *any* evidence was before the court upon which the trial court could have found that the vendees sustained any damage.

It is completely unclear whether the attempted rescission by the Russes resulted from a belief that they were overcharged in price for the property, whether they believed that the property was represented to be larger than it actually was, whether the profit gained from the operation of the business was not as large as they had been led to believe, all of which embraced their contentions at trial, or whether as they claim on appeal the rescission was due to other problems. That determination was made adversely to the vendees by the trial court and I believe the record sustains that determination.

Much has been said of the question of "water rights" in the majority opinion but the record nevertheless reveals that the only question presented in the record regarding water was the right to "transport water" to the subject property through a ditch running across the property of the adjoining landholder.

The record only reveals that a long-established right existed in the subject property to take water from Grouse Creek. The record further reveals that only once in 1966 was that right interfered with. At that time the predecessors of Carrie diverted the water of Grouse Creek to a hot water swimming pool for the purpose of cooling the waters therein. The record is absolutely devoid of any indication that such diversion resulted in damage to the then occupants of the subject property (the vendors) or that any other interference ever took place.

Turning now to the question of the right to "transport water," the record discloses that only once was there any interference therewith. During December 1969, the then adjoining landowner, one Carrie, constructed a new road across his adjoining property and cut the ditch transporting water from Grouse Creek to the subject property. Such action took place during the wintertime when irrigation water was unnecessary. The damage, if any, which resulted from that action was highly controverted. The record shows that the vendors were called upon by the vendees to assist in remedying the situation. The ditch was reopened and the vendors made an offer to split the cost of any litigation or whatever else might be necessary to remedy that ditch transportation problem. Although the vendees contended that the well on the property went dry because the ditch furnished the source of water for the well, such was highly controverted and resulted in the finding against the vendees.

In my opinion the trial court was presented with a mass of hotly controverted and highly conflicting evidence concerning the fraudulent misrepresentation on the part of the vendors regarding the sale of a going business. The trial court as the finder of the facts concluded that the plaintiffs had not sustained their burden of proof of clear and convincing evidence as to certain elements laid down as necessary by the law of Idaho. I would affirm the judgment of the trial court.

McFADDEN, J., concurs.