245 P.2d 423

TUCSON FEDERAL SAVINGS & LOAN ASS'N v. AETNA INVESTMENT CORP.

No. 5461.

Supreme Court of Arizona.

June 16, 1952.

Fickett & Dunipace, of Tucson, for appellant.

Stahl, Murphy & Bishop, of Phœnix, and Krucker & Evans, of Tucson, for appellee.

UDALL, Chief Justice.

Aetna Investment Corporation, an Arizona company which is engaged in the insurance business with its principal place of business in Phoenix, was awarded damages by the superior court in the sum of $10,000 against defendant Tucson Federal Savings and Loan Association, a corporation, for the breach of a written agreement theretofore entered into between them. The matter is now brought before us for review.

In the interest of clarity we will refer to the defendant-appellant as Tucson Federal and to the plaintiff-appellee as Aetna.

Tucson Federal is a federal savings and loan association organized and existing under the Home Owners Loan Act of 1933, 12 U.S.C.A. § 1461 et seq., and carrying on its business in Tucson, Arizona. Under its charter and the rules and regulations of the Federal Home Loan Bank, by whom it is supervised, Tucson Federal is required to obtain fire and extended coverage insurance as collateral security on all mortgage loans made by it. Tucson Federal on November 30, 1941 entered into a written agreement with Aetna to provide this coverage. The contract, which recites a consideration of mutual promises, was to run for a ten-year period, and it obligated Tucson Federal to purchase exclusively from Aetna all policies of insurance needed in connection with its business, to be paid for at the rate at which said policies of insurance and bonds are written in Pima County, Arizona. Aetna on its part agreed to secure such insurance and bonds as "may be needful or required" by Tucson Federal.

For nearly five years the parties operated under this agreement but with a change in the directorate of Tucson Federal its board of directors on September 16, 1946 revoked and rescinded, effective immedi-

ately, the prior agreement. Suit by Aetna followed, seeking damages. By its amended answer Tucson Federal admitted the execution of the written agreement and that since September 16, 1946 it had refused to comply with same. It then alleged certain affirmative defenses, viz: lack of authority of its then officers to enter into the agreement; lack of knowledge of the board of directors of Tucson Federal concerning the existence of the agreement; absence of consideration; violation of the statute governing restraint of trade; fraud perpetrated upon it by its former president, Joseph G. Rice, for the purpose of his own enrichment, etc., etc. Following a trial upon the merits before the court sitting without a jury, the court found as a fact that the agreement was entirely honest and fair; that there was an adequate consideration for the same; that as a direct and proximate result of Tucson Federal's breach of the agreement Aetna had been damaged in the sum of $10,000. Appropriate conclusions of law were made resolving all issues favorable to Aetna, and judgment in accordance therewith was regularly entered. This appeal followed.

Appellant's opening brief contains some 15 assignments of error and 17 propositions of law, covering in all 28 pages, hence it is impracticable to set them out in extenso. The contentions which we deem deserving of consideration will be hereafter set forth with the pertinent facts relative thereto.

### Restraint of Trade—Monopoly

Tucson Federal contends that since it is bound to purchase its entire insurance requirements from the Aetna, that the agreement is in restraint of trade under section 74–101, A.C.A. 1939, and therefore illegal and void. The pertinent parts of section 74–101, supra, as follows:

"A trust is a combination of capital, skill, or acts, by two (2) or more of section 74–101, supra, is as follows: purposes:

\*　　\*　　\*　　\*　　\*　　\*

"To prevent any competition in the manufacture, making, transportation, sale or purchase of merchandise, products or commodities, or to prevent competition in aids to commerce;

\*　　\*　　\*　　\*　　\*　　\*

"Any such combination is against public policy, unlawful and void, and no person may form or be in any manner interested, either directly or indirectly, as principal, agent, representative, consignee or otherwise, in any trust as herein defined. The creation or maintenance of a monopoly within the state, or the attempt to create or maintain a monopoly within the state, is unlawful and prohibited."

This presents a question of first impression in this state but there are many cases cited to us by counsel for both sides from other jurisdictions upon the problem. Counsel for Tucson Federal principally rely upon Wright v. Southern Ice Co.,

Tex.Civ.App., 144 S.W.2d 933, and many other Texas cases holding in effect that under a statute similar to section 74–101, supra, an exclusive contract to buy all of a person's requirements of a commodity from one source is an unlawful combination in restraint of trade as it tends to lessen competition.

We think the construction given the statute by the Texas courts is too strict and upon the facts of this case would not be in accord with justice and common sense. It will be noted that in the later case of Brown v. Faulk, Tex.Civ.App., 231 S.W.2d 743, the court found that a contract whereby the defendant obligated himself to sell his entire production of milk to the plaintiff so long as the defendant was indebted to the plaintiff was valid. The Texas court also expressly retreated from its previous pronouncement in the Wright case and held that such a contract was not illegal in the absence of proof that the intention was to create an unlawful combination in restraint of trade.

The majority rule seems to be as expressed in Great Western Distillery Products v. John A. Wathen D. Co., 10 Cal. 2d 442, 74 P.2d 745, 746, as follows:

"Statutes are interpreted in the light of reason and common sense, and it may be stated as a general rule that courts will not hold to be in restraint of trade a contract between individuals, the main purpose and effect of which are to promote and increase business

in the line affected, merely because its operations might possibly in some theoretical way incidentally and indirectly restrict trade in such line."

The contract in the instant case does not affect or attempt to control the insurance rates in the Tucson area as the premiums were to be the same as the "board rates" existing at the time the policies are issued. Competition was only indirectly affected. There is nothing in the record to indicate that the parties did not enter into the contract in good faith or that they intended to create an unlawful combination to control the insurance market. Public welfare is not involved and the restraint upon one party is no greater than the protection required for the other party. We hold that for an agreement to be invalid as a restraint of trade it must be an attempt or must actually tend to control prices or that it unfairly stifles competition or the free flow of trade and commerce. This contract falls far short of being an unlawful restraint of trade.

## Consideration

It is contended by Tucson Federal that the contract sued upon was illegal and void in that there was no valid consideration to support it. There are two ingenious arguments advanced, first: that any claimed consideration moving from Aetna to Tucson Federal would be a direct violation of sections 61–331, 61–336, and 61–341, A.C.A.1939. These sections are a part of the insurance regulations.

Specifically they forbid rebating; require an insurance agent to have a license; and set out charges that are prohibited. We confess that we are unable to follow the tenuous reasoning of counsel whereby these provisions would be held applicable to the admitted facts of this case. Certainly under the agreement in question the borrowers paid no more nor less than they would have paid had the insurance been placed elsewhere, and had the Tucson Federal lived up to its contract to place with Aetna the insurance which it required its borrowers to carry there would have been no financial outlay on Tucson Federal's part except for the cost of the limited number of policies it directly acquired for its own protection. There was no rebating on Aetna's part as the premium charged was at "board rates". We quote the following excerpt from 44 C.J.S., Insurance, § 342b:

"Broadly speaking, a rebate, within the meaning of a statute prohibiting the giving of rebates, is a deduction from a stipulated premium allowed pursuant to an antecedent contract. * * *"

For a case involving a somewhat similar contract and very much in point, see Calvin Phillips & Co. v. Fishback, 84 Wash. 124, 146 P. 181, where the Supreme Court of Washington held that the contract did not violate their rebate statute even though the insurance agent was granted the exclusive right to write all fire insurance during the life of the mortgages as additional compensation. Secondly it is claimed that actually there was no consideration for the agreement, in that Aetna was only promising to do what it would be legally bound to do whenever it accepted a policy application and premium from an owner and hence there was no mutuality in this contract as between Aetna and Tucson Federal. Citing J. D. Halstead Lumber Co. v. Hartford A. & I. Co., 38 Ariz. 228, 298 P. 925; Pleasant v. Arizona Storage, etc., Co., 34 Ariz. 68, 267 P. 794. We believe that an examination of the agreement itself clearly indicates that each party to the agreement promised to conduct itself in a particular manner for a period of ten years. Tucson Federal promised to procure from Aetna all insurance policies of every description needed by it in the conduct of its mortgage loan business, and Aetna agreed on its part to furnish, at the standard prices, all such policies. Prior to this agreement Tucson Federal was under no legal obligation to acquire any insurance from Aetna, and by the same token Aetna was under no obligation to furnish any insurance to Tucson Federal. The moment the agreement was signed each party had a legal benefit and a legal detriment accrue to it which is legal consideration. The Federal Rubber Co. v. Pruett, 55 Ariz. 76, 98 P.2d 849, 126 A.L.R. 1238; 12 Am.Jur., Contracts, section 79. Also "a promise for a promise" is adequate legal consideration to support a contract. 12

Am.Jur., Contracts, section 113; 17 C.J.S., Contracts, § 97. Furthermore, section 1–111, A.C.A.1939, provides:

"Every contract in writing imports a consideration." Admittedly this is not a conclusive presumption but it did shift the burden of going forward with the evidence to prove the lack of consideration to Tucson Federal and the latter, by merely showing that there was no cash exchanged between the parties at the time the agreement was executed, failed to carry this burden. We hold that the evidence amply sustains the trial court's finding that the contract was supported by an adequate consideration and that the rebate statute was not violated.

### Contract extending beyond term of directors.

The directors of the Tucson Federal are elected for a three-year term, while this contract was to remain in force and effect for ten years from the date of its execution. It is contended by Tucson Federal that the contract is void for the reason that it extends and binds the corporation beyond the terms of the then acting officers and directors. To support this proposition we are referred to Edwards v. Keller, Tex.Civ.App., 133 S.W.2d 823; Clifford v. Firemen's Mut. Benev. Ass'n, 232 App.Div. 260, 249 N.Y.S. 713; Massman v. Louisiana Mfg. Cooperage Co., 177 La. 999, 149 So. 886; Kline v. Thompson, 206 Wis. 464, 240 N.W. 128. We have examined these cases and find they all involve employment contracts whereby the corporate officers have attempted to employ a person for a period extending beyond their terms. The courts held that the contracts were void because one board of directors cannot bind subsequent boards as to future personnel to carry out administrative details of the corporation. These cases limit the application of the rule to employment contracts, which we believe is sound.

It is the policy of the law as well as the courts to hold corporations to their contracts the same as natural persons. Ellet v. Los Altos Country Club Properties, 88 Cal.App. 740, 264 P. 270. This was not an employment contract, but an agreement to purchase a commodity, i. e., insurance. A natural person could have made such a long term contract and we see no reason why this corporation should not also be permitted to do so.

### Authority to enter into contract

By appropriate assignments of error Tucson Federal challenges—as not being supported by the evidence—the findings of the trial court that its officers had authority to enter into said agreement, its position being that the agreement of November 30, 1941 (here in question) is an unusual and extraordinary contract and not one made in the ordinary course of business; hence it maintains that to be valid the contract required specific approval by its board of directors which admittedly

was not procured as there is no specific reference to this contract anywhere in the corporate minutes. The record does show however that on November 8, 1940, the board of directors of Tucson Federal, by an appropriate resolution regularly adopted, granted its president and secretary general authorization

"to execute and deliver for and on behalf of the corporation all contracts, deeds, etc."

and a certified copy thereof was filed and recorded with the county recorder of Pima County. Later, on January 21, 1942, the minutes show the adoption of a resolution

"that all the acts of the officers and directors of the association in the past are hereby ratified, approved and confirmed."

Furthermore it is apparent from the manner in which Tucson Federal processed its loans that all of the officers and members of the board of directors must have known of the arrangement. Director Fred W. Fickett obviously knew of it for he, as spokesman for the present majority now in control of the corporation who were then seeking to oust J. G. Rice from his position as president of Tucson Federal, wrote the latter some two months prior to the repudiation of the agreement, stating:

"We have no intention that your resignation, if presented shall cause any change in the existing relations between Tucson Federal Savings and Loan Association and the Aetna Investment Corporation."

Impliedly the lower court found that the contract was one made in the ordinary course of business, and if this premise is sound, which we believe it is, then under the authorities the general authorization heretofore recited was ample to sustain the action of the president and secretary of Tucson Federal in entering into the contract. See, Childress v. Lucky Jew Lead & Zinc Co., 134 Kan. 743, 8 P.2d 376; Bloom v. Nathan Vehon Co., 341 Ill. 200, 173 N.E. 270, 72 A.L.R. 232; Elblum Holding Corporation v. Mintz, 120 N.J.L. 604, 1 A.2d 204. In any event the trial court's finding—which is amply sustained by the evidence—that the members of the board of directors of Tucson Federal were advised of said agreement and acquiesced in and ratified it, would independent of any general or special authorization warrant us in sustaining the validity of the contract. Where a contract has been executed in whole or in part, the courts look with disfavor upon a defense interposed by a corporation that its officers had no authority to execute it, and particularly is this true, where as here, the contract is found to be fair. There is no evidence that anything was done to the disadvantage of Tucson Federal, nor were any of their rights or interests impaired by the agreement. As a matter of fact it appears to us that the

contract was mutually advantageous to both of the contracting parties.

### Officer of both corporations

The contract was entered into on November 30, 1941, and was executed on behalf of Tucson Federal by Joseph G. Rice, its president, and attested by Alfred E. Kerr, its secretary. At this time Rice was the president of both corporations, a director of Tucson Federal and the majority stockholder of Aetna. For this reason Tucson Federal argues that the contract was void and subject to cancellation by it at any time.

The rule in Arizona is that corporations having the same officers and or directors may make contracts with one another if they are entirely honest and fair. The courts scrutinize these contracts very closely and will set them aside upon the slightest showing of unfairess to either corporation. Gould Copper Min. Co. v. Walker, 17 Ariz. 332, 152 P. 853; Garden Development Co. v. Warren Ranch, 35 Ariz. 254, 276 P. 839.

The lower court expressly found that the contract was honest and fair to both corporations. There was no evidence presented (except the argument of counsel for Tucson Federal) that would indicate that the contract was not fair. Tucson Federal only obligated itself to pay the current prevailing rate for these insurance policies and in return their mortgagors were insured by reliable old-line insurance companies. We see nothing in the contract or the subsequent dealing under the contract that fell short of fair and honest business practices.

### Damages

Tucson Federal further urge that the judgment of the lower court must be reversed because there was not sufficient evidence presented to sustain the damages alleged to have been suffered by Aetna. Counsel for Aetna devised a unique formula to prove their damages, which is as follows: Aetna made a recapitulation of the records of Tucson Federal to show the amount of mortgage business transacted by Tucson Federal for two years before the breach of the contract on September 16, 1946, and the same information for the period involved in this suit, i. e., September 16, 1946 to March 31, 1948. Aetna presented a recapitulation of its books for the same two-year period, showing the total amount of gross premiums it received from the insurance policies placed with it by the Tucson Federal. This left but one unknown, i. e., the amount of gross premiums it would have received on insurance placed by the Tucson Federal had the contract remained in force, which sum Aetna then computed by the use of a simple algebraic equation. Evidence was then presented by Aetna of the average rate of net commissions earned by insurance agents for writing this type of insurance which was from 25 to 30% of the gross premiums. Applying the lowest average rate (25%) to the

figure thus obtained from the use of the equation the loss of net commission amounted to $12,058.58, which was the amount alleged in the (amended) complaint as damages. The trial court presumably took into consideration prorata incidental expenses of Aetna (such as office expense, etc.) necessary to process such policies and awarded Aetna $10,000 as damages.

While the method just described presents only an approximation, i. e., a rough yardstick and is open to some criticism because it does not prove Aetna's damages to a mathematical certainty, we think under the circumstances of this case it would be impossible to do so and therefore the means employed was justified. When as here, one party to the contract will as a natural and proximate result of the breach suffer actual damages, the courts will not require the injured party to do the impossible by proving its damages down to the last penny. This was pointed out in Jacob v. Miner, 67 Ariz. 109, 191 P.2d 734, 738, wherein the court quoted the following from Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S. Ct. 248, 250, 75 L.Ed. 544:

"'It is true that there was uncertainty as to the extent of the damage, but there was none as to the fact of damage; and there is a clear distinction between the measure of proof necessary to establish the fact that petitioner had sustained some damage, and the measure of proof necessary to enable the jury to fix the amount. The rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount.'"

The court then followed with its own statement of the rule:

"This distinction is fundamental for where, as here, it clearly appears that a party has suffered damage, a more liberal rule should be applied in allowing the court or jury to determine the amount of the damage than should be applied in weighing evidence on the question of whether or not the acts complained of will result in any damage at all to the party upon whom rests the burden of proof."

We hold that the evidence presented to the lower court was sufficient to sustain the award of damages. To hold otherwise would in practical effect let the wrongdoer go free and deny Aetna any relief.

### Evidentiary matters

Seven assignments of error challenge the correctness of the trial court's rulings on the admission of certain evidence over Tucson Federal's objections. Counsel cites cases to support the general proposition that incompetent evidence is inadmissible and prejudicial error. In most

instances counsel's objections were general in nature, i. e., the evidence was asserted to be "incompetent, irrelevant and immaterial" and counsel has failed to point out either to the trial court or in his brief wherein the evidence complained of came within these general objections. Nowhere does he designate the evidence as a conclusion or hearsay, etc., nor does he cite authorities directly in point to sustain the proposition that such evidence was inadmissible or that it influenced the decision of the trial court. We do not feel that such a showing deserves or merits separate consideration.

Furthermore we have examined the transcript as to the alleged errors and in view of these inadequate objections we think the trial court was eminently fair and correct in its rulings. This case was tried to the court without a jury and if error was committed the rule laid down in Leigh v. Swartz, 74 Ariz. 108, 245 P.2d 262, would control as there was ample competent evidence to sustain every finding of fact by the trial court. There is no merit to this series of assignments.

It would unduly extend this already lengthy opinion to discuss the remaining assignments of error; suffice it to say that each of them have been carefully considered and found to be without merit.

Judgment affirmed.

STANFORD, PHELPS, DE CONCINI and LA PRADE, JJ., concur.