513 P.2d 992

Olive ENDERS and Vickie Christensen,
Plaintiffs-Appellants,

v.

WESLEY W. HUBBARD AND SONS, INC.,
a corporation, Defendant-Respondent.

No. 11075.

Supreme Court of Idaho.

July 9, 1973.

Rehearing Denied Sept. 24, 1973.

L. F. Racine, Jr., Pocatello, for plaintiffs-appellants.

Merrill K. Gee, Pocatello, for defendant-respondent.

BAKES, Justice.

This appeal involves the enforceability of a lease extension agreement covering approximately 1,000 acres of real property near Soda Springs, Caribou County, Idaho.

On March 29, 1960, Mary Enders Sheridan and her husband, Arthur P. Sheridan, as lessors, entered into a lease agreement with Wesley W. Hubbard & Sons, Inc., an Idaho corporation, covering the 1,000 acres of real property involved in this appeal. The terms of the lease were ten years (April 1, 1960, to March 31, 1970), at $4,000 per year, with an option for a five year renewal. The lease was drafted by the lessor's attorney and the $4,000 annual rental was also fixed by the lessors.

In April, 1965, the lessor, Mary Enders Sheridan, who apparently owned the 1,000 acres as her separate property, initiated negotiations with respondent corporation for a long term lease extension agreement on the property in order to provide income for her family, and to keep the property intact for her granddaughter, Vickie Christensen, one of the appellants herein. The extension agreement was again prepared by lessor's own attorney and was delivered to Mrs. Sheridan who deferred signing until she could talk to her son, Glen Enders. On October 14, 1965, Mrs. Sheridan, who was 81 years of age and suffering from cancer, signed the extension agreement. Subsequently, in January, 1966, Mr. Sheridan signed the extension agreement. The agreement continued and extended the existing lease for an additional twenty years to March 31, 1990, on the same terms and conditions as the original lease, including the $4,000 yearly rental.

Mrs. Sheridan died on March 11, 1966, and her son Glen Enders died on April 21, 1966. Olive Enders, one of the appellants herein, is the widow of Glen Enders, and under the wills of Mrs. Sheridan and Mr. Enders has received two thirds of the real property involved in this appeal. Vickie Christensen, daughter of Glen and Olive Enders, and the other appellant herein, received the other one third of the property.

In March, 1970, respondent corporation tendered to appellants the annual rental payment of $4,000 for the year 1970. Appellants refused to accept this tender and on April 1, 1970, served a notice of termination of the lease and a notice to vacate the premises. Plaintiff-appellants Enders and Christensen then brought this action on May 4, 1970, alleging the following claims for relief: first, that the original lease had terminated and that respondent was holding over on the premises without permission of appellant even after being given written notice. Further, appellants alleged that respondent had failed to properly maintain and operate the property pursuant to the original lease agreement. Appellants also alleged in their complaint that respondent had breached the original agreement by subleasing the property to others for grazing purposes without obtaining written permission. In their second cause of action, appellants alleged that Mr. and Mrs. Sheridan were very elderly persons in ill health and were not fully competent to enter a contract, and therefore the extension agreement should be declared null and void by reason of undue influence and inadequate consideration.

The trial was held in September, 1971, and in a judgment entered on December 10, 1971, the trial court, having sat without a jury, determined that appellants should take nothing by their complaint, that respondent corporation had not breached the terms of the agreement, and that the extension agreement is valid and that the respondent corporation is entitled to quiet enjoyment of the leased property.

Appellants in their assignments of error contend that the trial court erred in failing to declare that respondent breached both the original and the extended lease by failing to properly maintain and develop quality grasses on the property, by failing to develop and utilize the irrigation system, and by permitting sections of the property to develop into swampland. Appellants contend that the trial court erred in failing to declare the extension invalid because of

the incompetence of the Sheridans at the time the extension agreement was executed, that the agreement was not supported by consideration and that the rental payments are grossly inadequate.

Appellants contend that permitting other ranchers to graze their cattle on the leased property constituted a breach of the lease provision prohibiting subleasing without permission. Appellants further contend that the trial court erred in determining that the five year lease option and the extended lease were merged, and finally appellants argue that the trial court erred in failing to award a reasonable rental of $10,000 per year and that it was error to grant respondent possession of the property.

■■■■ Regarding these assignments of error concerning the operation of the ranch, appellants claim that the original lease agreement was breached by respondent's failing to properly maintain and develop the leased property as called for in the original lease. The trial court, after hearing the evidence, personally viewed and observed the condition of the premises and found that "there is substantial evidence that the defendant (respondent) has performed the lease terms and operated the premises in a farmer-like manner . . . ." Although there was conflicting evidence as to the maintenance of the leased property, it is a rule of long standing in this Court that the trial court is the arbiter of conflicting evidence, Brammer v. Brammer, 93 Idaho 671, 471 P.2d 58 (1970), and that the findings of fact of the trial court will not be disturbed on appeal if supported by substantial and competent, though conflicting, evidence. Reardon v. Union Pacific R. R., 93 Idaho 833, 475 P.2d 370 (1970); Olson v. Quality-Pak Co., 93 Idaho 607, 469 P.2d 45 (1970).

Appellants' second contention on appeal regarding the alleged incompetence of Mrs. Sheridan at the time of execution of the lease extension is also without merit. Mrs. Sheridan was seriously ill during this period of time. However, the trial court specifically found that "Mary Sheridan, at the time of and prior to the execution of the agreement, was acting voluntarily and was competent as evidenced by the fact that she was operating and managing her hotel business, supervising employees, writing checks, making purchases, (and) traveling alone by bus."

This Court in Olsen v. Hawkins, 90 Idaho 28, 408 P.2d 462 (1965), stated regarding competency to enter into a contract:

"It is a fundamental rule that the law will presume sanity rather than insanity, competency rather than incompetency; that every man is capable of managing his own affairs and responsible for his own acts. Likewise it is presumed that each man is capable of understanding the nature and effect of his contracts.

"It may also be stated that as a general rule, all proceedings involving the competency of an individual to execute a valid contract start with the presumption of competency and that this presumption may be relied upon until the contrary is shown. (Omitting citations)." 90 Idaho, at 33, 408 P.2d at 464.

The Court in *Olsen* continued by citing the following with approval:

" 'The test of mental capacity to contract is whether the person in question possesses sufficient mind to understand, in a reasonable manner, the nature, extent, character, and effect of the act or transaction in which he is engaged; . . . It is not necessary to show that a person was incompetent to transact any kind of business, but to invalidate his contract it is sufficient to show that he was mentally incompetent to deal with the particular contract in issue, * * *.' " Id.

The Court in *Olsen* also stated:

"In this connection it should be noted that where a person possesses sufficient mental capacity to understand the nature of the transaction and is left to exercise his own free will, his contract will not be invalidated because . . . he was aged or both aged and mentally weak.

(Omitting citations)." Id. at 33, 408 P. 2d at 454.

Mental capacity to enter into a contractual agreement is a question of fact to be determined by the trier of fact as of the time of the transaction. Miller v. Miller, 88 Idaho 57, 396 P.2d 476 (1964). The trial court specifically found that Mrs. Sheridan was competent at the time of the transaction in question. A review of the record and the evidence produced at trial clearly supports the trial court's finding that at the time of executing the lease extension agreement Mrs. Sheridan was mentally competent. Again where there is substantial, competent evidence upon which the trial court can base its findings, those findings will not be disturbed on appeal. Leonardson v. Moon, 92 Idaho 796, 451 P. 2d 542 (1969); Williams v. Havens, 92 Idaho 439, 444 P.2d 132 (1968); Rockford Equipment Co. v. J. R. Simplot Co., 92 Idaho 218, 440 P.2d 338 (1968); White v. Boydstun, 91 Idaho 615, 428 P.2d 747 (1967); Olsen v. Hawkins, 90 Idaho 28, 408 P.2d 462 (1965); Melton v. Amar, 83 Idaho 99, 358 P.2d 855 (1961). Cf. McPheters v. Hapke, 94 Idaho 744, 497 P.2d 1045 (1972).

Next we consider appellants' contentions that the lease extension agreement was not supported by consideration and that the rental payments were grossly inadequate. It is fundamental contract law that when entering into a bilateral contract, such as the lease extension agreement, a promise for a promise is sufficient legal consideration. Knack v. Industrial Commission, 108 Ariz. 545, 503 P.2d 373 (1972); United Press International, Inc. v. Sentinel Pub. Co., 166 Colo. 47, 441 P.2d 316 (1968); Torgeson v. Connelly, 348 P. 2d 63 (Wyo.1959); Saletic v. Stamnes, 51 Wash.2d 696, 321 P.2d 547 (1958); Miller v. International Harvester Co. of America, 179 Kan. 711, 298 P.2d 279 (1956); Tucson Federal Savings & Loan Assn. v. Aetna Inv. Corp., 74 Ariz. 163, 245 P.2d 423 (1952); Corbin, Corbin on Contracts, Vol. I, § 142 (1963). The lease extension agreement consisted of a promise to pay an annual rental of $4,000 for an additional twenty years in exchange for a promise to lease the property for an additional twenty years beginning March 31, 1970. Each promise served as consideration for the other. There is no merit to appellants' argument that the lease extension agreement was not supported by consideration.

With regard to appellants' contention that the annual rental reserved in the extension agreement is grossly inadequate, it is the established rule that Courts will not inquire into the adequacy or sufficiency of the consideration bargained for by the parties, except as it might reflect on a party's competence or consciousness of action. Quayle v. Mackert, 92 Idaho 563, 447 P.2d 679 (1968); Bates v. Capital State Bank, 21 Idaho 141, 121 P. 561 (1912). Having determined that the trial court properly concluded that Mrs. Sheridan was competent, appellants' contention is without merit.

Appellants' final assignment of error relates to the failure of the trial court to find that the lessee had subleased the premises without the written consent of the lessors in violation of the terms of the original lease as extended. In determining this issue, the circumstances of the alleged subletting must be reviewed in some detail. The facts which appellant alleges constitute a subletting are not really in dispute, the real issue being the legal effect of those facts as proved. In the following analysis of this issue we have taken the facts from the testimony of the defendant's officers themselves, and from the persons whose cattle were placed upon the premises, which testimony was basically uncontradicted.

A summary of the evidence discloses that the lessee was in the cattle business at the time it executed the lease in 1960. When the lessee received possession of the property in the spring of that year, it had other property upon which they were running cattle, including a home base property at Grace, Idaho. The nature of the End-

ers ranch was such that it provided late spring, summer and early fall pasture and hay, but during the balance of the year the cattle had to be wintered at other locations because of the climate at the Enders ranch. Thus, the Enders ranch was not the base of operations of the lessee but was primarily additional pasture and hay ground for the animals owned by the lessee Hubbard family corporation. Wesley Hubbard, the father of Deon Hubbard and Craig Hubbard, was the titular head of the family corporation and he operated the entire operation until 1963 or 1964 when he became blind. His son, Deon, also an officer of the lessee, held a Ph.D. degree in agricultural economics and was teaching at the Utah State University at Logan. Another son, Craig, was apparently a student at Utah State University during this time. As a result of the blindness, Wesley Hubbard retired from the ranching business and sold the home ranch base property at Grace, Idaho, and the cattle herd owned by the family corporation. As a result, the operation on the Enders ranch changed from an operation which previously had been a year round owned-herd type operation to an operation wherein Deon Hubbard would buy cattle in the spring to pasture on the Enders property and then the cattle would be resold in the fall. However, Deon Hubbard testified that because of economic and other factors this proved

unsatisfactory and at that point the lessee corporation determined not to buy cattle each spring to pasture on the Enders ranch but determined to "sell the grass" by permitting others to pasture it. During this time Deon Hubbard had a ranch in the Bonners Ferry, Idaho, area and the Enders ranch operation necessitated his commuting from Bonners Ferry, Idaho, during the summer to supervise the operation of the Enders ranch. This, coupled with his teaching responsibilities at Utah State University, no doubt constituted some of the "other factors" resulting in the determination to no longer buy and sell cattle to pasture on the property but to "sell the grass.' " Initially, in 1967 and 1968, the Hubbards ran some cattle on the property which they bought and sold; however, most of the cattle on the Enders ranch were those of other producers. The mixing of herds proved unsatisfactory for several reasons, the main one being the interbreeding of different breeds of cattle of the different herds that were pastured on the property. As a result, in 1969, the lessee, acting through Deon Hubbard, turned over the pasturing operation to a joint venture between a Mr. Rigby and a Mr. Cochran who after that time paid an annual rental for all of the grass on the property. The rental for 1969 was based upon what Deon Hubbard and Rigby & Cochran determined to be the carrying capacity of the ranch.[1]

---

1. Regarding the Rigby-Cochran arrangement and the computation of the annual pasture rental, Deon Hubbard testified: "A. In 1968 I had a lot of different people's cattle. It came the time of the year to put the cattle on, and the prices were such that it didn't look feasible for me to buy cattle and put on that spring, they were hard to get and the price was high, and it was getting close to the grazing season, so I got in touch with Don Carter and I said, 'Don, what am I going to do with this pasture?' And he said, 'I think I can find some people . who will put some cattle on there,' and he got me in touch with Mr. Cochran and Mr. Rigby, and we made an agreement with them on a per-head basis for numbers of cattle. He got me in touch with Mr. Denton and some other people down around Preston as to the number of cattle

that should be put on, and so, in effect, I managed the cattle that summer. There were different people and, well, one of the men from down at Preston had Santa Gratuis that got into Mr. Cochran's heifers and he didn't like that very well because he wanted his own bull in there. So the next year the same situation existed, and I went to them and I said, 'Do you want some pasture again this summer?' And they said, 'Only under the condition we can have it all. We don't want Santa Gratuis bulls in our heifers.' So we sat down and we said, 'Well, the place will handle about 700 head, yearlings at $12.00 a head is $8,400,' and this is the way we attempted to figure it out. And they said, 'Well, if we can have the whole thing, if we can control it so we know whose bulls are in there and so on, we will buy all of your grass,' and so

From that time on Rigby & Cochran generally controlled whose cattle, and in what numbers, would go on to the Enders ranch. As to how Rigby & Cochran divided up the cattle to go on the premises, Deon Hubbard testified that "they worked that out among them." Mr. Rigby, in his testimony, described the arrangement as, "I was involved in the leasing of the grass on the place, just pasturing cattle there." "We was just to get the feed off the place, that's all we was concerned about, that's all we leased it for in the first place."

After Rigby & Cochran assumed control of the cattle on the premises, any arrangements which other operators made to put cattle on the Enders ranch were generally made through Rigby & Cochran and payment for the pasturage by other operators was usually made to Rigby & Cochran, although the record is not entirely clear regarding who the other operators made the payments to.

The evidence is clear that the lessee Hubbard corporation handled the irrigation, the fencing and the other repairs that were done on the premises, and Rigby & Cochran, and the other operators who put their cattle on the ranch through Rigby & Cochran, had nothing to do with the irrigation or the fencing other than perhaps immediate and temporary repairs when their cattle would break out. The foregoing facts are substantially undisputed in the record, and the issue which we must now decide is whether or not this practice which was engaged in variously during the years from 1967 through the date of the trial constituted "subletting" of the premises without the written consent of the lessor, in violation of the terms of the lease.

The provision against subleasing in the lease reads as follows:

"That said lessees shall not assign this lease or sublet any part of said premises without the written consent of the lessors first had and obtained;"

This Court in Groth v. Continental Oil Company, 84 Idaho 409, 373 P.2d 548 (1962), distinguished between the assignment of a lease and the subletting of a part wherein the Court, at page 413, 373 P.2d at page 550, quoted from American Jurisprudence:

"'As a general proposition, if by the transaction the lessee conveys the entire term and thereby parts with all reversionary interest in the property, the transaction is construed to be an assignment; but if there remains a reversionary interest in the estate conveyed, it is a sublease.'"

An updated version of the language quoted by this Court is found in 49 Am.Jur.2d, Subletting, § 480 (1970), wherein it is stated:

"A sublease is a grant by a tenant of an interest in the demised premises less than his own, retaining to himself a reversion, and a subtenant is a person who rents all or a portion of the leased premises from the lessee for a term less than the original one, leaving a reversionary interest in the first lessee." 49 Am.Jur. 2d, § 480, p. 469.

We have been unable to locate any Idaho cases dealing with the question of whether or not a pasturage arrangement such as occurred in this case constitutes a subletting in violation of a covenant similar to that quoted above. However, two Idaho cases do shed some light upon the subject.

In Aveline v. Ridenbaugh, 2 Idaho 168, 9 P. 601 (1886), the defendant Ridenbaugh had orally rented a piece of real property to one Tong who had cut and stacked cord

___

this is the kind of agreement that's existed since '68.
"Q. In other words, then, the price for the feed for 1969 and subsequent years is based upon 700 animal units per month at the rate of $12.00 per yearling?

"A. Yes, and it didn't matter to me if they substituted cows for yearlings or if they substituted dry. If they put on fewer cattle, they had more grass for that number of head. If they put on more cattle, they had less grass for that number of head." Rptr. Tr. pp. 218–219.

wood upon the property. Ridenbaugh and Tong then executed a one year written lease agreement which had a provision prohibiting any subletting of the premises. The day after Tong entered into the written lease with the defendant, Tong sold all of the cord wood on the leased property to the plaintiff and gave plaintiff one year to remove the wood from the premises. Upon learning of this sale the defendant Ridenbaugh claimed that it was in violation of the covenant against subleasing and refused to allow plaintiff to remove the wood. Plaintiff, the purchaser of the wood, brought an action in equity to restrain defendant from obstructing the road into the premises. This Court held that the sale of the wood to the plaintiff " . . . was clearly a subletting of the premises, against the express provisions of the lease," 2 Idaho 168, at 171, 9 P. 601, at 602, because it gave plaintiff one year to remove the wood at any rate he wished, or could store the wood upon defendant's premises for one year, giving plaintiff complete domain over defendant's premises for the entire year.

In Page v. Savage, 42 Idaho 458, 246 P. 304 (1926), this Court had under consideration a circumstance where a mining company granted to a lessee a right to remove minerals. The lessee in turn granted a right to remove minerals to a third party. The Court reached the conclusion that "the grant from the company to Savage and the grant from Savage to Page were leases and not licenses." 42 Idaho 458, at 469, 246 P. 304, at 307.

A number of other jurisdictions have passed specifically on the question of whether or not the permitting of pasturage of cattle by lessees is a violation of a covenant similar to that involved in this case, and have concluded that it is not. Thus, in Harrelson v. Miller & Lux, 182 Cal. 408, 188 P. 800 (1920), the California Supreme Court held that it was not a sublease to permit others to place sheep on leased land for grazing purposes. In *Harrelson* the plaintiff leased to one Crow who permitted the defendant to pasture the land with his sheep. The plaintiff learned of this and ordered the defendant to remove his sheep. The California Supreme Court held that it was not a sublease to permit others to place sheep on the land to graze on the stubble. The Court said:

"The contract between Crow and defendant amounted essentially to the sale of the feed coupled with the mere license to come on the land to use it. If Crow had a right to sell the feed at all, he certainly had a right to grant the right to use it on the land, for obviously the stubble at least could not be otherwise utilized. That the granting of such a right is not a violation of a covenant against subletting has been directly held in Baldwin v. Jacobs, 182 Iowa 789, 166 N.W. 271, 273." 188 P. 800, at 802.

The case of Baldwin v. Jacobs, 182 Iowa 789, 166 N.W. 271 (1918), has been relied upon by other state courts in support of the view that a pasturage arrangement does not constitute a subleasing in violation of a covenant such as involved in this case. The Montana Supreme Court in Bond & Mortgage v. Pulley, 95 Mont. 337, 26 P.2d 645 (1933), discussed and followed the *Baldwin* case as follows:

"In Baldwin v. Jacobs, 182 Iowa, 789, 166 N.W. 271, 272, it appeared that one Jacobs was the owner of a farm which he leased to Archer for one year. Before the expiration of his lease Archer sold considerable rough feed in the form of shocked corn, with the option to the purchaser either to remove the same or to feed it upon the place. He also had upon the place considerable other rough feed in the form of standing cornstalks and blue grass. Baldwin purchased the removable rough feed and exercised the option to feed it upon the place; he also had an arrangement with Archer whereby he was to bring cattle upon the place and feed the standing rough feed at the price of $1 per head per month. While this contract was in the course of performance, Jacobs, the landlord, brought

action against Baldwin and Archer whereby he charged a breach of the lease by Archer 'in that he had sublet the premises or assigned his lease thereon.' In its opinion the court said: 'It may be conceded that the arrangement between Archer and Baldwin bordered close to an assignment or subletting. And yet there is surely a field within which a tenant may freely contract with third parties for the sale and utilization of the products of the farm. It is not unusual that an occupant of land deems it advantageous to sell his matured crop while standing in the field. Such an arrangement necessitates an entry by the puchaser for the purpose of utilizing the crop. It has been held that such an arrangement is not a violation of a proviso against subletting. (Omitting citation). Taking the testimony of Archer and Baldwin as true as to what the arrangement between them was, we think it quite clear that it worked no violation of the terms of the lease." 26 P.2d at 647.

In two decisions the Washington Supreme Court has held that temporary pasturage arrangements on leased land do not constitute a sublease. Golden v. Mount, 32 Wash.2d 653, 203 P.2d 667 (1949); Vander Vate v. Watson, 19 Wash.2d 68, 140 P.2d 964 (1943). In the *Vander Vate* case the Washington Court stated:

"These temporary pasturage arrangements did not purport to create any kind of an estate in the persons who pasture their cattle in the Watson field." 140 P.2d 964, at 967.

In Thompson on Real Property, it is stated that the covenant against subletting or assignment is not broken by the renting of pasture rights on a farm after the crop has been gathered, because the tenant still remains in possession. Vol. 3A, § 1212, p. 76, citing Harwood v. Hopkins, 4 Ky.Law Rep. 631.

The foregoing cases, though not exhaustive, generally reflect that where a lessee is farming or pasturing a property, and he permits the grazing of less than all of the premises, or for a temporary period all of the premises, the courts generally construe the arrangements to be one of license rather than a sublease. However, in this case, the entire pasture on the Enders ranch, which was the only agricultural commodity produced by the ranch, was sold for several years to Rigby & Cochran for an annual gross rental figure. More importantly, Rigby & Cochran generally controlled the numbers of cattle which went on to the premises, and whose cattle could be brought on to the premises. On balance, we feel that the totality of the sale of all of the pasture rights, together with the transfer of substantial control of those pasturage rights to Rigby & Cochran, constitutes a subletting of the premises in violation of the terms of the lease. The Iowa Court observed, in Baldwin v. Jacobs, *supra,* that the arrangement there "bordered close to an assignment or subletting." Here we feel that the lessee has gone over the line, and the arrangement between the lessee and Rigby & Cochran constituted a subleasing of the premises in violation of the provision of the lease.

Defendant argues that the notice to vacate the premises served by the plaintiffs on April 1, 1970, did not set out as one of the grounds for vacating the premises that the defendant had sublet the premises in violation of the lease provision. Plaintiffs on the other hand counter that they were not fully aware of the Rigby-Cochran arrangement until the time of trial.[2] Plain-

2. Plaintiffs submitted interrogatories to defendant and received the following answer:

"INTERROGATORY NO. 6: State specifically the amount of moneys for use of the premises paid by Ivan Rigby for the use of all or a portion of the subject premises during the years 1968, 1969, and 1970, and state the terms of the agreement for each said year with Ivan Rigby.

"ANSWER NO. 6: None." Clerk's Tr., pp. 53, 57.

tiffs' amended complaint, filed May 4, 1970, does allege as one of the grounds for breach of the lease and termination of the leasehold interest of the defendant that the defendant had sublet the premises in violation of the terms of the lease. The lease does not make the giving of notice to vacate a condition precedent to filing suit for breach of the lease, but provides that if the lessee does not cure any defaults within thirty days after written notice given to them, that the lessors at their option may re-enter and take full and complete possession of the premises and that the lessees forfeit all rights in the premises and the lease. It is the right of re-entry and termination of the leasehold that is conditioned upon thirty days' written notice of the breach of the lease.

■ The serving of the amended complaint [3] upon the defendants would be a sufficient written notice of the breach of the provision of the lease against subleasing, which would commence the running of the period for the lessee to cure any such breach. The record is clear that as of the time of trial in September, 1971, the lessee had continued the same pasturing arrangement with Rigby & Cochran and therefore had not cured the breach of the provision in the lease against subleasing. We therefore conclude that the respondent-lessee's rights to the premises have terminated. I. C. § 6–303; § 6–316. Hunter v. Porter, 10 Idaho 72, 77 P. 434 (1904).

The judgment of the trial court is reversed and the matter remanded for further proceedings consistent with this opinion.

Costs to appellant.

DONALDSON, C. J., and SHEPARD, McQUADE and McFADDEN, JJ., concur.

---

However, on trial Deon Hubbard testified regarding having received money from Rigby & Cochran in 1968, 1969, 1970 and 1971. The inconsistency was explained as follows:
"Q. Would you explain why the answer is 'None' in light of the testimony you have just given us in Court today?
"A. Because I didn't sell him any portion of the premises.
"Q. Well, now—
"A. I sold the grass, I sold the crop, and I have never considered herd stock cattle to come under the category as you ask in the question." Rptr. Tr. pp. 46–47.

3. Only the amended complaint is contained in the transcript on appeal. The original complaint is not.